McKnight's Executors v. Walsh.

---

## McKNIGHT'S EXECUTORS vs. WALSH.

1. A direction by a testator that his executors invest $25,000 of the estate and pay the interest thereof to his daughter during her life, and after her decease that the executors appropriate and expend the legal interest of said sum towards the proper maintenance and education of the daughter's child or children, authorizes only so much of the income to be expended as will maintain and educate her child in a manner proper or suitable to his condition or fortune. Under such direction, no part of the income could be appropriated to the support of the father without an order.

2. In general, a father is bound to support his infant children, and is not entitled to have the income of their estate appropriated for their support without an order of some proper court, based upon his inability to support them properly.

3. Nor is he entitled to the whole of the income of his child's estate, on the ground that it is necessary to enable him to support and maintain an establishment suitable for such child as a member of his family. Where the executor has paid over the whole income, in such case, to the father, such payment will not be confirmed, even if made in good faith.

4. Where a trustee has invested the trust fund in business, trade, or speculation, he can be called upon to account for the profits made by it, or at the option of the *cestui que trust*, to pay interest at the highest rates, and with yearly rests, or compounded. But it is only in cases of gross misconduct; never for a mere neglect of duty, as, for not investing the trust funds, but letting them lie idle.

5. A trustee cannot be called to account for the profits of a business in

which the fund was originally invested lawfully, merely because he neglected to withdraw it from that business.

6. But where a part of the trust fund consists of moneys advanced to the trustee, and the trustee, in violation of the testator's directions, neglects to invest, and continues to use the money in his own business, and where, by not paying in his debt, he is enabled to keep certain railroad shares, of which he actually received the income half yearly, the trustee will be charged with annual rests and compound interest. The excess on the half yearly interest in this case being too small for investment, the trustee will only be held for the yearly rests.

7. Where a trustee, in violation of the trust, fails to invest the fund, and uses it in his own business, he is not entitled to commissions.

8. Where the executor was a debtor of the testator, and a trust fund established by the testator consists of the debt, which the executor has never paid into the estate, but upon which he paid the interest as it accrued, he is not entitled to commissions.

9. An executor or his representative is not entitled to commissions on any part of the assets not collected.

10. The principal of a specific sum bequeathed as a trust fund is not liable to commissions; they must come out of the residue of the estate.

11. The executor, by agreement with the infant's father, having kept $1000 as commissions, the amount must be included in the balance on which compound interest is to be computed.

Argued on final hearing upon bill, answer, and proofs.

*Mr. Browning* and *Mr. Williamson,* for complainants.

*Mr. Pitney* and *Mr. Beasley,* for defendant.

THE CHANCELLOR.

The bill in this cause is exhibited by the executors of John L. McKnight, deceased, for the settlement of the account of their testator, as executor of the last will of Edward R. McCall, deceased, and as trustee under that will. Edward R. McCall, of Bordentown, died July 30th, 1853. By his will, of which he made John L. McKnight, his brother-in-law, executor, he directed his executor to invest $25,000 of the estate in some safe security, in his own name, as trustee for his daughter, Sarah W. McCall, in trust, to pay her the interest for her own separate use during her life, and after

her decease for any child or children of his daughter during minority ; he, the executor, appropriating and expending the legal interest of said sum toward the proper maintenance and education of such child or children, and to pay the principal to them on their attaining twenty-one. The residue of his estate he gave to his only child, Sarah W. McCall.

McKnight proved the will and accepted the trust. He paid the debts, and paid the residue of the estate above the $25,000 and debts and expenses, to the daughter of testator. But he never made or exhibited an inventory or any account of the estate. Sarah, the daughter, married Joseph C. Walsh, October 3d, 1853. She gave birth to a son, Robert C. Walsh, the defendant, June 3d, 1855, and died on the 10th of that month.

Walsh, on the 4th of January, 1858, married Anna Wood, and died on the 13th of June, 1862. Mrs. Anna Walsh is defendant, as guardian of her step-son, Robert C. Walsh.

McKnight, at the death of E. R. McCall, was indebted to him in the sum of $21,200, which McCall had loaned to him on his bond, then due, and in $671 interest accrued upon it, and also in the sum of $2000, money which McCall had put in his hands to purchase stocks, which had not been bought. This indebtedness amounted in the whole to $23,871. This amount was never paid into the estate, but was retained by McKnight, together with enough cash of the estate to make the sum of $25,000. The stocks and other securities of the estate were handed to the daughter without being changed. The cash in bank, and the proceeds of sales of chattels, to a small amount, were more than sufficient for debts and expenses, and the balance was paid to her as part of the residue.

The interest of the trust fund, during the life of Mrs. Walsh, was paid to her or her husband. But the principal of that fund was never invested on any security by Mc-Knight, who canceled the bond and retained the fund.

Soon after his marriage Mr. Walsh suggested the necessity of investing this trust fund as directed by the will. McKnight

proposed to retain it in his hands for his own use. He owned a large amount of stock of the Camden and Amboy Railroad Company, and of other corporations; he owned a controlling amount of the stock of the Bordentown Bank, and controlled the bank, and owned largely of other stocks; he was also engaged in other enterprises that required capital, and as shown by the cashier, was a frequent borrower at the bank. The money he had got of McCall was, without doubt, properly used in some of these matters, and it evidently was advantageous to him to retain it. He urged its retention, and showed Walsh how it would be of advantage to him to let it remain. It would be liable to no state tax while in his hands, and he intimated that if it remained he would charge no commissions, and showed the disadvantages and expenses that would occur on the taking of security. Walsh had procured the opinion of that eminent lawyer, George Wood, esq., a native of Burlington, but then of New York, showing that it was the duty of the trustee to separate this fund from his own estate, and place it on good security. McKnight, however, prevailed, and induced Mr. and Mrs. Walsh to allow him to retain this fund, he having deposited with the cashier of his bank, as collateral security, two hundred and fifty shares of its capital stock, with power to transfer them to his name as trustee, and also bonds and mortgages held by him to the amount of $25,000, with power to withdraw either of these collaterals, leaving the other; this was in December, 1853. Mr. Walsh had resigned his commission in the navy soon after his marriage, remained without employment, and had no resource but the fortune of his wife. He was a gentleman of cultivation and refinement, and of extravagant tastes and habits. The residue of McCall's estate, amounting to about $13,000, which had all, except a few hundred dollars, been paid over after his marriage, was soon spent, and shortly after the death of his wife he was in need of funds.

In this situation Walsh readily entered into an agreement with McKnight, which was reduced to writing and signed by both, dated August 9th, 1855. By this the trust fund

was to remain as it was then invested.  The trustee was to pay Walsh the half year's interest then in arrear, and after that $1000 of the interest, yearly, for the proper maintenance and education of the infant; was to retain $500 a year for two years, making $1000 on the whole, in full for his commissions, and was to invest the remaining $500 of the interest, after the first two years, for the benefit of the infant.

Some time in 1856, Walsh found out that McKnight had taken from the cashier not only the mortgages deposited as collateral, which had been done by the written consent of Mrs. Walsh, but also the certificates of bank stock left with him.  This, and an unfounded report that McKnight was embarrassed by endorsements for a son who had failed, alarmed Walsh for the safety of the fund, and he determined to compel him to invest the fund as directed by the will. For this purpose he employed the present Chief Justice, then at the bar.  Mr. Beasley put himself in immediate communication with McKnight, called upon him, and wrote to him, and insisted upon the fund being secured.  He asked for investment and security only, not for any increase of allowance to Walsh.  McKnight, unwilling to give up the fund, offered to deposit securities as collateral, and volunteered an offer to increase the allowance to Walsh out of the interest. The negotiation ended in McKnight making a deposit of two hundred and fifty shares of the stock of the Camden and Amboy Railroad Company in the hands of Mr. Beasley, as collateral security, to remain until other security should be given, satisfactory to Mr. Beasley.  This agreement of pledge, executed by McKnight and Mr. Beasley, under seal, was signed July 14th, 1856.  It was considered by Mr. Beasley only as a temporary measure, until a permanent investment should be made.  In the negotiations, Walsh wrote to Beasley that the use of the whole income was a great inducement to him, but he feared it was hung out as a "bait or catch," to make him more easily satisfied with the securities.

These securities remained in Mr. Beasley's hands until McKnight's death, and still remain there.  They are ample

to secure the trust fund. McKnight paid Walsh $1000, yearly, for the first two years, and after that the whole income of $1500, until the death of Walsh, according to the intimation conveyed through his counsel, the written agreement to pay $1000, being unchanged, and Walsh gave no further trouble about investment or securities. After the death of Walsh, McKnight paid to the guardian of the infant annual allowances, approved of and directed to be paid as proper for his education and maintenance—at first, while he resided in New York, by the surrogate of the city, who appointed her his guardian, and after they removed into this state, fixed by this court.

The accounts of the trustee were, in this cause, referred to, and have been stated by a master. The master allowed the trustee the full income until the death of J. C. Walsh, paid to him upon the understanding above mentioned. He also allowed the $1000 retained by the trustee as commissions. He charged the trustee with interest on the excess of the income above the amounts paid for support and education since the death of J. C. Walsh, but only with simple interest, and did not make annual rests in the account so as to compound the interest.

To this account exceptions are taken on the part of the infant. These can be ranged under three classes:

*First.* To the allowance of the whole income during the life of J. C. Walsh, when it is alleged that he should have been allowed only so much as was proper and necessary, and actually expended for the support of the infant.

*Second.* To the allowance of $1000, as commissions, when the trustee was entitled to no commissions.

*Third.* To the allowance of simple interest only. The exceptant contends that, as the money was retained by Mc-Knight in his business, and not invested, that he should have been charged with the profits made in the business, or at least with compound interest by semi-annual rests.

As to the first class, it is not claimed, on part of the complainants, that the proper education and support of the infant

VOL. VIII.                    K

required the whole income of $1500. The infant was seven years old at the death of his father, and it is admitted that a much less sum, less than one-half, would have been sufficient for his support and maintenance in a manner suited to his condition and fortune. Less than half was allowed after the death of the father for some years, and was ample for the purpose.

But the allowance of the whole is claimed on two grounds: *first,* that the will of McCall authorized the expenditure of the whole; and *secondly,* that the father was entitled to it as necessary for him to support and maintain an establishment suitable for this child as a member of his family.

The will was made two years before the testator's death, and before the daughter was married or had any child. It provided for her death, leaving one or more children—the number could not be foreseen, and very probably for the object in view, directed the expenditure of the income for the proper maintenance and education of such child or children. It is, perhaps, unguardedly drawn, but the intention of the testator cannot be mistaken and is expressed. The object, and only object, is " the proper maintenance and education of the child or children," and the person who is to apply or expend it is the executor. The will did not authorize it to be expended for the support of the father of the child, nor for such maintenance or education as was not proper or suitable to the condition or fortune of the child; nor when the actual amount expended for the maintenance and education was only $500 yearly, to pay the whole income of the estate, being $1500, to the father, for that or any purpose. In general, a father is bound to support his infant children, and is not entitled to have the income of their estate appropriated for their support without an order of some proper court, based upon his inability to support them properly. But in this case the testator directed this income to be appropriated for that purpose, and no order was required while the expenditure was within the direction. But none of it could, by virtue of this direction in the will, be appropriated to any other

purpose, as the support of the father without an order, even if it was clear in this case such order could have been made.

On the other ground, it is claimed that the court should now confirm such payments made in good faith, if it would on application, have made such order. That it would have been made, is contended on the force of some precedents in England and in this court, and one in the Vice-Chancellor's Court in New York. The position assumed is that such allowance will be made from the estate of an infant as will be sufficient to maintain his father, mother, brothers, and family in a style suitable to his estate and condition.

The dicta and authorities in the English cases are founded upon the law of primogeniture and the established custom among the nobility and gentry, by which the heir-at-law upon whom the family seat devolves, as well in infancy as when of age, is, by their customs, bound to keep up the family mansion as a home for his sisters and younger brothers, and is allowed out of his estate sufficient for that purpose.

The only decision or application of the rule that I find, is the case of *Bradshaw* v. *Bradshaw*, 1 *J. & W.* 627, in which a liberal allowance was directed to be made to an infant heir in consideration of the support of an infant brother, an illegitimate child of his father and mother before their marriage, who had lived with and been provided for by the father before death. In *Harvey* v. *Harvey*, 2 *P. W.* 21; *Pierpoint* v. *Cheney*, 1 *P. W.* 493; *Lanoy* v. *Athol*, 2 *Atk.* 447; *Petre* v. *Petre*, 3 *Atk.* 511, no application was made of this rule, but it was stated as the rule of the Court of Chancery. In New York the only case seems to be that of the *Matter of Burke*, determined by Vice-Chancellor Sandford, 4 *Sandf. Ch.* 617. In that case an *ex parte* order had been made, allowing the father of the infants, aged eleven and thirteen, the yearly sum of $3500 for their support. The income of these children was between $3500 and $4000 yearly. The fortune of one was $30,000, of the other $60,000, on arriving of age. The father actually expended for them $1561 in one year, besides keeping them at his house when home from school. His

income was barely sufficient to maintain himself, his second
wife and family, in the manner in which they were living.
Upon application of relatives of the children, the allowance
was referred to a master, who reported $1500 per annum as
sufficient for both. The Vice-Chancellor, upon exceptions
by the father, increased the amount to $2500, on the ground
that the father required this to enable him to keep up such
an establishment as a home for these daughters as he was
keeping, suitable to their rank and expectations. This case
stands by itself in New York. The case of *Wilkes* v. *Rogers,*
6 *Johns.* 566, referred to in support of it, contains nothing to
maintain its principles. It goes far beyond any decision,
doctrine, or dicta in any of the English cases. I am not
willing to adopt a principle by which the fortune of infant
daughters derived from their mother, shall be appropriated
to maintain their father, his second wife and her family, in a
manner that his own means will not warrant, because it is
suitable to the condition and prospects of the infants. They
might, perhaps, be authorized to pay their proportionate
share of the expense of such establishment, but the principle
should go no further.

The authorities in New Jersey relied on are three orders
made by Chancellor Williamson on *ex parte* applications.
The first, in 1854, in the case of Thomas Potter's children.
The estate consisted of $612,000 in cash, and the mansion-
house at Princeton, valued at $40,000. The income exceeded
$40,000. The mother of the three infants continued to live
in the family mansion in the same manner as their father had
done in his lifetime. And the Chancellor allowed the $8000
yearly for their support, and for the two sons of seventeen
and nineteen, respectively, who were away for their educa-
tion, such sums as should be expended for them. The income
of each of these children seems to have been from $5000 to
$8000; the allowance was $2666, yearly, to each.

The second was the allowance to the widow of Morgan G.
Colt for the support of her three children. Her son had a
fortune of $40,000, her two daughters $20,000 each. Their

income was the interest of these sums. The mother had no fortune and no income, and desired to keep up an establishment as a home for her children under her personal care. The Chancellor allowed her $3500 a year for this purpose— little more than half their incomes.

The third case is that of James Wood's two children. They had a fortune in the hands of a trustee of $20,000 ; the whole income was the interest, $1200. Their father was entirely without means, improvident, and intemperate. The Chancellor directed the trustee to pay to the father $7 per week for board, and $200 per annum for the clothing of each, amounting to $1126 in the whole.

The statement of these cases shows how entirely they differ from the present. Were this an application for an order to allow this income to be paid for the future, such order could not be sustained on them as precedents.

But there is no precedent for the allowance of such payments for the support of the father, when made without the order of some competent court. It would be dangerous to make such precedent. Trustees and relatives, as here, would combine to use the whole fund, however unnecessary, and then claim allowance because done in good faith, and in the exercise of a discretion committed to them.

In this case the trustee can only be allowed for so much as was paid for the proper maintenance and education of the infant. All beyond that he has paid in his own wrong. And I am not satisfied that this payment was made in good faith. On the contrary, I am convinced that it was made by a bargain made by him with the father that it should be paid, provided the father would not insist upon his performing a duty required of him by law as to investing these moneys ; a duty well known to him, and which it was profitable for him to neglect. There is no foundation for the claim that he did it by the advice of counsel. The only opinions before the death of Mr. Walsh were those of Mr. Wood, adverse to allowing the money to be uninvested, and to the allowance of the whole income for support ; and those were not opin-

ions of his own, but of adverse counsel. Mr. Beasley and Mr. Wood, by consenting to the deposit of the railroad stock, did not advise that as sufficient, or the payment of the whole interest as proper, but it was adopted as a means of securing with safety for a temporary purpose, a fund thought to be in jeopardy. The only opinions ever had by McKnight were those of Mr. Beasley and Mr. Cannon, after the death of Walsh, but he was guided by neither. Neither of those were intended to approve, or did approve, his payment of the whole income to Walsh, though one of them alluded to a case in which a larger amount had been allowed than was required for support.

I am willing to make a large allowance for the support of this infant until his father's death, while still under seven years old. $700 a year, I am satisfied, will cover all that was expended for that purpose. And I am willing to allow it without reference to a master, because, in the situation of this case, it would be impossible for a master to ascertain the amount expended or required. To the extent of all beyond that sum, the exception to this allowance is sustained.

As to the charge of compound interest, or the profits on the railroad stock, or any other business in which the money was engaged, although some principles are clear and well settled, yet their application is uncertain. The courts and decisions differ. Where a trustee has invested the trust fund in business, trade, or speculation, he can be called upon to account for the profits made by it, or at the option of the *cestui que trust,* to interest at the highest rates, and with yearly rests or compounded. This is decreed as a penalty for his breach of duty. But it is only in cases of gross misconduct, never for a mere neglect of duty, as for not investing the trust funds, but letting them lie idle. But in cases where the trust fund has been invested in trade or speculation, or continued in them, profits or compound interest have been generally required. 2 *Story's Eq. Jur.,* § 1277; *Hill on Trustees,* \*372, \*375; *Lewin on Trusts* 361, 363, 364; *Perry*

*on Trusts,* § 471; *Raphael* v. *Boehm,* 11 *Ves.* 92; *William* v. *Powell,* 15 *Beav.* 461; *Schieffelin* v. *Stewart,* 1 *Johns. Ch.* 620; *Barney* v. *Saunders,* 16 *How.* 572.

In most of the cases where the trustee has been charged with compound interest or profits for using the trust fund in his own business, the trust fund was embarked by him in the business; but in *Jones* v. *Foxall,* 15 *Beav.* 388, the defendant, Foxall, was a member of a firm to which the fund had been loaned before the trust. By the articles of settlement, which constituted him trustee, he was directed to call in and invest this sum. He neglected to do so, but continued to use it in the business of the firm of which he was a member. This was held by the master of the rolls to make him liable to compound interest. That case is much like the present. Here the money, or almost the whole of it, had been advanced by McCall in his lifetime. It had, beyond question, been used by McKnight in his business. Contrary to express direction to invest, he retained the money in his own hands, and kept it in his business. His railroad stocks, evidently, from the date of the certificates, were not bought with it. But to pay in this fund might have obliged him to sell them. It is not possible to ascertain how he did use this money. It was originally invested in his own business, in which he had then a perfect right to invest it as he pleased. And there is no authority or principle that will require a trustee to account for the profits of a business in which the fund was originally invested lawfully, merely because he neglected to withdraw it from that business.

But I think that this is a proper case to charge the trustee with annual rests and compound interest, both on the ground of his violation of trust in neglecting to invest and continuing to use the money, as Foxall did, and on the further ground that in at least one of his investments, that in railroad shares, which he was enabled to keep by not paying in his debt, he actually received the income half yearly. I think, from the fact of his allowing those shares to remain in pledge for this trust fund from 1856 until now, we are

entitled to conclude that the fund was by him considered invested in those shares. He received the dividends half yearly, and had actually the use of them in his business, including the part that constituted the interest of this fund. He frequently borrowed money, and had the use of this, and either made or saved the interest upon it. The excess on the half yearly interest was too small to invest, and, although he had the use of it, yet as he could not have invested it, he will only be held for yearly rests. The interest on these, in the whole, amounted to a considerable sum, and as in his transactions this interest was, without doubt, used by him, and the interest on it gained or saved by him, it is right that he should account for it, not merely as a penalty for culpable neglect, but as gains actually made by him out of the trust fund. The exception as to compound interest must be sustained, and the account taken with yearly rests, and the interest compounded at the rates adopted by the master. But no interest must be charged on the amounts paid to J. C. Walsh in excess of the $700 per annum, as the trustee has not had the use of such excess or received interest upon it.

The trustee, in this case, is not entitled to any commissions. He has violated his trust by not investing the fund, and using it in his own business. *Warbour* v. *Armstrong*, 2 *Stockt.* 263; *Frey* v. *Demarest*, 2 *C. E. Green* 71, and *Moore* v. *Zabriskie*, 3 *C. E. Green* 51, are authorities to show that in New Jersey this forfeits commissions.

But independent of this rule, the trustee is entitled to charge no commissions on this trust fund as against this defendant. *First.* Because he has never collected it, or done anything as executor relating to it. At the death of the testator he owed this amount to the estate; he owes it still; one dollar of it has never been paid. The bond has been canceled, but that was not payment. He never even went through the form of depositing in bank the amount to his credit as executor. When an executor dies without having collected any part of the assets, he or his representatives are not entitled to commissions on the part not collected. They

belong to the administrator *de bonis non* who shall collect them. The act (*Nix. Dig.* 645, § 26,) directs that commissions shall be allowed in reference to pains, trouble, and risk incurred in settling the estate. As to this amount, he has taken no pains, trouble, or risk in collecting or settling it; his only pains have been as a debtor to defer payment of his debt to the estate, which still remains, and which an administrator might have been appointed to collect after his death. The payments of interest were made by him as debtor, as it accrued on the sum he owed; he would have made these as such to McCall had he lived.

Again, the commissions on the principal of the trust fund, had he collected it, could not have been allowed out of, or deducted from it, but from the residue of the estate. Every bequest of a specific legacy or a specific sum must be paid entire; the commissions, like the other expenses, must come out of the residue of the estate. The $25,000 belongs to the defendant, free from expenses or commissions. That he paid over the residue without deducting commissions, if he was entitled to them, was his own folly, unless he intended not to charge them to his niece. Walsh could not bind the infant or this fund for their payment. Had the trustee invested this fund, and collected the interest on the investment, and paid it over to the person entitled to it, he would have been entitled to such commissions on that as the proper tribunal should allow, not such as was agreed upon by a person who has no interest in the amount.

If commissions could be allowed, as against the infant, upon the income, the whole amount, at the highest rate allowed by law, would be less than $700, to be taken on the settlement of the account—that is, upon the final decree in this suit. The amount retained by him, with simple interest, would now exceed $2000.

The charge for commissions must be wholly disallowed; and as this sum of $1000 was retained by him, it must be included in the balance on which compound interest is to be computed.