Frederick Hemsley died March 15th, 1915, leaving a last will and testament which was duly probated in the office of the surrogate of Atlantic County. This last will and testament, among other things, created several trusts and designated The Pennsylvania Company for Insurance on Lives and Granting Annuities as trustee. For each of his three grandchildren, Quincy A. Gillmore, Jr., Frances West Hemsley Gillmore (now Williams) and Frederick Hemsley Gillmore, the decedent created three separate trusts of $25,000 each, for which he bequeathed $75,000 to the designated *Page 29 
trustee. For his sister, Elizabeth H. Avery, he created a trust for which he bequeathed $50,000 to the designated trustee. With the residue of his estate he created a trust for his widow and his daughter, Frances West Hemsley Gillmore.
No accounting was filed by the trustee until 1944. To this accounting the life tenants and remaindermen filed exceptions. The matter was thereupon referred to Hiram Steelman, Esquire, a special master, to audit the accounts and to hear and report upon the exceptions. This matter is now before us upon exceptions taken to the report of the special master. Exceptions were so taken both by the life tenants and the remaindermen and by the trustee. For the purpose of convenience we shall hereafter refer to the life tenants and remaindermen as the exceptants and to the trustee as the accountant.
The original exceptions taken by the exceptants were directed entirely at the investments by the accountant in mortgages, the security for which was real estate located in the State of Pennsylvania. These mortgages included not only whole mortgages but as well participations in mortgages and real estate mortgage bonds.
For a concise statement, the objections of the exceptants may be classified as follows: (1) that the trustee had no authority to invest in mortgages, parts of mortgages or real estate mortgage bonds where the real estate which was security for the mortgages was located in the State of Pennsylvania; (2) that participations in mortgages or real estate mortgage bonds were illegal investments because the issuing companies had not complied with the law of the State of New Jersey; (3) that some of the mortgages, mortgage participations and real estate mortgage bonds were illegal investments because of the nature and value of the real estate mortgaged; (4) that the trustee should be surcharged because it failed to properly diversify its investments and invested too large a portion of the corpus of the estate in mortgages, mortgage participations and real estate mortgage bonds.
In addition to contesting the several grounds heretofore set forth as the basis of the exceptants' claim for liability on *Page 30 
the part of the accountant, the trustee affirmatively alleges as defenses (1) that the exceptants are estopped from disputing the legality of the investments because of an implied approval, and laches; (2) that the breaches of the trustee's duty, if any occurred, were mere technical breaches, and that because of the lack of fraud or bad motive they are absolved from any resulting loss; (3) that the management of the estate generally shows a profit. In addition, both the exceptants and the accountants attack the allowance of interest as made by the special master on the investments which he conceived were illegal.
For the purpose of a clear understanding of the exceptions and the law involved, these several exceptions will be treated in the order hereinabove set forth.
 I. INVESTMENTS IN MORTGAGES WHERE THE SECURITY WAS PENNSYLVANIA REAL ESTATE.
Exception is taken to the determination of the special master that it was legal to invest in mortgages where the land involved was Pennsylvania real estate.
All of the questioned mortgages were purchased before the passage of P.L. 1938 ch. 198, and this statute is therefore inapplicable.
At the time these investments were made the pertinent statute authorizing investments in whole or entire mortgages read as follows:
"VI. In bonds secured by first mortgage upon real estate; provided, the amount loaned upon any such bond and mortgage shall not at the time of making such loan exceed sixty per centum of the estimated worth of the real estate covered by such mortgage; provided, also, that the rate of interest upon any of the above enumerated securities in which such investments may be made shall not be less than three per centum nor more than six per centum per annum; this act shall not apply where the deed of trust, or the last will and testament of any testator, or any court having jurisdiction of the matter specially directs in what securities the trust funds shall be invested, and every such court is hereby given power to specially direct by order or orders, from time to time, additional securities in its discretion in *Page 31 
which trust funds may be invested and any investment thereof made in accordance with any such special direction shall be legal, and no executor, administrator, guardian or trustee shall be held liable for any loss resulting in any such case." P.L. 1907ch. 146 p. 383 § 6.
By P.L. 1920 ch. 192 p. 377, as amended by P.L. 1922 ch. 144p. 255, and P.L. 1927 ch. 81 p. 144, the investment in parts of bonds or bonds secured by trust mortgages and in participation certificates which entitle the owner to a proportionate share in a number of mortgages under a trust agreement, was authorized. The statute as finally amended in 1927 reads in part as follows:
"1. Any executor, administrator, guardian or trustee whose duty it may be to loan moneys entrusted to him in addition to the securities in which he may invest the same under the provisions of the act to which this is a supplement, may invest the same in shares or parts of bonds secured by mortgage or bonds secured by trust mortgage, and in participation certificates or coupon bonds which shall entitle the holder to a proportionate share in a series or number of mortgages and bonds or extensions or renewals thereof, deposited under a trust agreement with a trust company, bank or title guarantee corporation organized under the laws of this State, or a national bank authorized to do business in this State, which shall be a first lien upon improved real estate, provided the amount of such mortgages shall not at the time of the making of such loan exceed sixty per centum of the estimated worth of the real estate covered by such respective mortgages at a rate of interest not less than three per centum nor greater than six per centum per annum; * * *."
For present purposes, the phraseology concerning any limitation on the word "mortgages" was not changed from 1920 to 1927, and continued as above set forth during the entire period during which the accountant purchased such bonds or participation certificates.
It is conceded that the statutes did not, by their express terms, restrict investments to mortgages encumbering New Jersey real estate. The theory advanced by exceptants is that in no event were mortgages encumbering real estate, the situs of which was beyond the New Jersey boundary, a good investment.
As authority they cite McCullough's Executors v. McCullough,44 N.J. Eq. 313; 14 Atl. Rep. 123, and Macy v. MercantileTrust Co., 68 N.J. Eq. 235; 59 Atl. Rep. 586. *Page 32 
In McCullough's Executors v. McCullough, supra, there was involved a request for instructions as to whether investments might be made in mortgages on lands in Minnesota. It appeared that when the testator died the funds directed to be invested for certain trust purposes were invested in small mortgages upon Minnesota real estate, with interest rates ranging from seven to twelve per centum per annum. The complainant-executor desired to invest in similar mortgages. This case was decided in 1888. At that time P.L. 1881 ch. 115 p. 130, provided as follows:
"That any executor, administrator, guardian or trustee, whose duty it may be to loan the money entrusted to him, may invest the same on bond secured by first mortgage upon real estate estimated to be worth at the least twice the amount loaned, at a rate of interest not less than five per centum, nor greater than six per centum per annum."
"* * * that nothing in this act contained shall apply to cases where * * * the court having jurisdiction of the matter, specially directs in what manner the trust fund shall be invested."
It is clear, from the applicable statute, that these mortgages, regardless of the situs of the real estate, would not have been legal investments unless special permission for such investment were specifically granted by the court, since the allowable statutory maximum interest rate was six per centum and the mortgages in question bore interest at a rate of from seven to twelve per centum. Although the case as reported does not disclose that the litigation was instituted under P.L. 1881,supra, it is apparent that the executors were seeking special directions for leave to invest in securities not specifically authorized by said statute. The question of the legality of making an investment in extra-territorial mortgages, without special leave, was not before the court. This situation must be borne in mind when considering the ultimate decision. All that the Chancellor there decided was that under the circumstances, he would not "specially direct" the investment in certain particular securities. The case is no authority for the proposition that no investment in mortgages upon lands outside of New Jersey was a legal investment. *Page 33 
In Macy v. Mercantile Trust Co., supra, the court had before it three points which were recited in the opinion as follows:
"* * * first, whether the trust company as residuary legatee under the will could be obliged, against its consent, to accept any securities for investments made by the executors, instead of cash, in payment or satisfaction of the legacy; and if so, then, second, whether the mortgages were investments authorized to be made by the executors; and third, whether, if so authorized, they were sufficient securities for the loans made on them."
The court there said:
"The second question is whether the investments in New York City mortgages were investments of an authorized character. The investments being first mortgages on real estate (and for present purposes being considered as safe and sufficient security for trust investments), the question is whether the investment is illegal and unauthorized merely because the lands are not situated in this state. No statute or decision of our courts has yet established this hard and fast rule. In McCullough v.McCullough, 44 N.J. Eq. (17 Stew.) 313 (Chancellor McGill, 1888), an application was made by trustees for instructions as to investing on lands in Minnesota. Such investment was disapproved, but the disapproval by the court was based on consideration of all the circumstances of the case and of the security of all the parties interested. It was not refused because it was in itself and in any event illegal or unauthorized. No later or other decision in New Jersey has been referred to. Ormiston v.Olcott, 84 N.Y. 339 (1881), which was referred to with approval in the McCullough Case as to the objections to such investments, expressly declines to hold that such investments are necessarily illegal (at p. 343), and goes no further than to declare the general rule to be that investments beyond the jurisdiction of the court should not be sustained unless in rare and exceptional cases, and under very unusual and peculiar circumstances."
It is to be noted that the court there expressly stated that no statute or decision of our courts had held an investment *Page 34 
in mortgages illegal and unauthorized merely because the real estate involved was not situate in New Jersey.
In 1904 when this case was decided, P.L. 1902 ch. 240 p. 699, provided as follows:
"IV. Bonds secured by first mortgage upon real estate, in such proportion to the value of such real estate and at such a rate of interest upon the amount loaned as a reasonable and prudent investor, dealing with his own funds, under like circumstances, would require; provided, however, that said sum so loaned shall not exceed two-thirds of the value of said real estate, and that the rate of interest to be charged thereon shall not be less than four per centum per annum; this act shall not apply where the deed of trust or the last will and testament of any testator, or any court having jurisdiction of the matter, specially directs in what manner the trust fund shall be invested."
Again, the pertinent statute must be kept in mind when reading the opinion. The court there held that the investment in New York mortgages was not unauthorized because of the location of the real estate. The case is authority for the approval of the investments in New York mortgages there made under the then effective statute.
The general statement that it is to be desired that New Jersey fiduciaries invest in New Jersey mortgages because of the ability to control proceedings and ascertain value has considerable merit. However, it has never been a harsh or hard rule of law, whether by statute or by case, that investment in mortgages on lands located in our sister states is in and of itself illegal.
Cases cited from other states are not particularly helpful as the statutes there considered are so completely different from ours.
At the time the investments sub judice were made they were authorized by P.L. 1907 p. 383 or P.L. 1920 p. 377, as amended. Since P.L. 1881, supra, fiduciaries have been authorized by statute to invest in mortgages. Over the years this act was often amended but the language of the numerous amendatory acts, up to the time of these disputed investments, describing the qualifications and requirements of the investment, never contained any specific requirement that the situs of the real estate be within New Jersey. The mere fact that *Page 35 
lands which were security for these mortgages were not located in New Jersey is insufficient, in itself, to affect the legality of the investment.
 II.
VALIDITY OF INVESTMENTS IN PARTICIPATION CERTIFICATES OR MORTGAGE BONDS WHERE THE ISSUING BANK HAD NOT OBTAINED A CERTIFICATE OF AUTHORITY TO DO BUSINESS IN NEW JERSEY.
The master found that all of the investments in mortgage participation certificates and mortgage bond issues were illegal and surcharged the trustee therefor. As disclosed by the state of the case, the trustee first invested in participations in mortgages and mortgage bond issues in 1920 and continued to so invest until 1931. The trustees of these mortgages were either The Pennsylvania Company or the Real Estate Land Title Trust Company. It becomes necessary, therefore, to ascertain by what right such investments were made.
Until 1920 there was no authority for a fiduciary to make investments of this type. In that year, by legislative enactment, fiduciaries were authorized to make investments in bonds and parts of bonds or participation certificates secured by a trust mortgage. P.L. 1920 ch. 192 p. 377, provided in part as follows:
"* * * that bonds and mortgages in parts of which any fiduciary may invest trust funds * * * shall be held for the benefit of such fiduciary * * * by a trust company, bank, or title guarantee corporation organized under the laws of this State, * * *."
In 1922 this statute was amended by P.L. 1922 ch. 144 p. 255, to read in part as follows:
"* * * that bonds and mortgages in parts of which any fiduciary may invest trust funds * * * shall be held for the benefit of such fiduciary * * * by a trust company, bank or title guarantee corporation organized under the laws of this State, or jointly by such a corporation, and an individual who is a citizen and bonafide resident of this State, * * *." *Page 36 
In 1927 this statute was again amended by P.L. 1927 ch. 81 p.144, to read in part as follows:
"* * * that bonds and mortgages in parts of which any fiduciary may invest trust funds * * * shall be held for the benefit of such fiduciary, * * * by a trust company, bank or title guarantee corporation authorized to do business in this State, or jointly by such corporation, and an individual who is a citizen and bonafide resident of this State, * * *."
The exceptants contend that since no official certificate of authority to do business in New Jersey was granted to The Pennsylvania Company until 1940, and since none was ever granted to the Real Estate Land Title Trust Company, that they were not "authorized to do business in this State" and the purchase of participations was contrary to the statute.
Accountants, on the other hand, contend that the provisions ofP.L. 1907 ch. 35 p. 68, are sufficient warrant to authorize any Pennsylvania bank to do business in this State without any formal official approval because of a reciprocal act of Pennsylvania passed June 8th, 1911, P.L. 710, 15 Purdon's Statutes, § 3141, or, that in any event, the expression "authorized to do business in this State" is so ambiguous, indefinite and uncertain as to require further definition. In the latter circumstance reference must be had to the custom or usage followed over a period of years to ascertain what the expression "authorized to do business" means.
It has been conceded by both parties hereto that the corporations in question fall into the category of a trust company or bank incorporated under Pennsylvania law, although no proof thereof has been submitted. In view of the fact that neither of them are New Jersey corporations, it becomes necessary to determine whether they were "authorized to do business in this State."
Any investments made prior to 1927, where the participation was in a mortgage held by a "trust company, bank or title guarantee corporation" not "organized under the laws of this State" were illegal investments. See P.L. 1920 p. 377, and P.L. 1922 p.255.
The crux of this problem is, what is meant by the expression "authorized to do business" which appears in P.L. 1927, supra? *Page 37 
At the time of the passage of the 1927 act there was a very clear line of demarcation and distinction between the manner in which individuals could obtain a charter for a bank or trust company and that in which individuals could obtain a charter for any other type of corporation. There were special requirements for such a charter. P.L. 1899 ch. 173 p. 431, as amended. Without meeting such requirements no charter could be granted. Private banks which included any "individual, association of individuals, partnership or joint stock association" (P.L. 1895ch. 368 p. 743, as amended) were "subject to the same control, supervision, inspection and examination to which incorporated banks" were subject, and for violation of the act, including acting as a bank without a license, were declared guilty of a misdemeanor.
Quite plainly, the legislature had decided in the interest of public policy and for the protection of the public that any group of persons desiring to do a banking business, either as individuals or in corporate guise, should comply with stringent provisions. No group of individuals could obtain a corporate charter as a bank without meeting these strict requirements, and an individual or group of individuals so functioning without a license committed a crime.
In 1890 the legislature passed an act which provided in part as follows:
"That every banking, savings, trust, guarantee, safe deposit, indemnity, mortgage, investment, loan and building corporation or association organized under the laws of other states or foreign governments, on application for authority to transactbusiness in this state, shall * * *." (Italics mine.) P.L. 1890ch. 251 p. 427.
In order to obtain authority to do business in New Jersey such foreign bank was required (1) to file a copy of its charter and a statement with our department of state; (2) to have at least $100,000 paid in capital; (3) to deposit at least $30,000 with our Secretary of State for the benefit of creditors; (4) to make annual reports in New Jersey. Upon compliance with the foregoing the statute provided as follows: *Page 38 
"* * * it may be admitted to transact business in this state upon a certificate of authority to be issued by the secretary of state * * *." (Italics mine.) P.L. 1890 ch. 251 p. 427.
The statute upon which accountants base their argument reads as follows:
"Sec. 1. Hereafter, no banking, savings, trust or safe deposit corporation created by any other state or by any foreign state, kingdom or government shall transact any business in this state, except to the extent that similar corporations of New Jersey are permitted to transact business in such state, kingdom or government; provided every such foreign corporation shall complywith all the requirements of the laws of this state applicable toit in doing business therein." (Italics mine.) P.L. 1907 ch. 35p. 68.
The gist of their argument is that since there exists a Pennsylvania act which permits New Jersey corporations to do business in that state, no formal affirmative application or grant of a license or permit by the State of New Jersey is required in order to authorize a Pennsylvania bank to do business in this State.
An examination of the cited Pennsylvania act discloses that a formal application is required for a non-resident corporation to obtain authority to do business in that state and that a violation of that act constitutes a misdemeanor. The Pennsylvania statute is not self-executing. It does not permit a foreign corporation to do business there without the necessity of first obtaining a license or permit. To term such a statute automatically reciprocal strains logical reasoning.
If accountants' reasoning were pursued to its natural conclusion, we would interpret our statute, which provides, "to the extent that similar corporations of New Jersey are permitted to transact business in that State," to make a formal application and license in some form similar to that of Pennsylvania a condition precedent to doing such business here. This is exactly what P.L. 1890, supra, requires.
The fallacy of accountants' reasoning is further apparent when they argue that the act of 1907, supra, liberalized the requirements theretofore existing.
The act of 1907 did not serve to liberalize the act of 1890 but actually further restricted the functions of a foreign *Page 39 
bank in New Jersey, "to the extent that similar corporations are permitted to transact business in such State." Theretofore there had been no restriction on the extent to which a foreign bank could function. Thereafter it could only function to the extent that New Jersey banks were permitted to function in the state of its domicile.
They ignore entirely the latter portion of P.L. 1907, supra, which provides that "every such foreign corporation shall comply with all the requirements of the laws of this State applicable to it in doing business therein." At the time of the passage of the 1907 act, the 1890 act was in full force, effect and virtue. No foreign bank could function in this State without meeting the requirements of the act of 1890, which was one of the laws of this State applicable to its doing business here. The State required strict compliance therewith. The requirement of the law of this State applicable to a foreign bank or trust company in doing business herein is found in P.L. 1890, supra.
The legislature must be presumed to have had P.L. 1890,supra, in mind when it passed the 1927 amendment, requiring that the bank acting as trustee under a mortgage indenture be "authorized to do business in this State."
Webster defines "authorize" as follows:
"1. To clothe with authority or legal power; to give a right to act; to commission, as, an authorized representative.
"2. To make legal, to legalize, to give authoritative permission to or for; to empower, warrant; as, to authorize commissioners to settle a boundary."
Consistent with this definition and having in mind the provisions of P.L. 1890 and 1907, supra, there is no doubt that the legislature intended a formal compliance with the provisions of the former act. "Authorized" can mean only that which the laws of the State have laid down as a requirement to obtain "authoritative permission." To hold otherwise or to employ the construction attempted by accountants could well result in permitting foreign banks to do business in this State who did not have the financial responsibility required of local institutions. No supervision or control could be exercised over them. *Page 40 
The two Pennsylvania banks who issued the participation certificates and mortgage bonds, not having complied with P.L.1890, supra, were not banks authorized to do business in New Jersey, and the investments in the participation certificates and mortgage bonds issued by them did not comply with P.L. 1927,supra.
In view of the foregoing, it is unnecessary to seek elsewhere for an interpretation of the statutes. Their terms are clear.
The investments in mortgage bonds and participation certificates, where the Pennsylvania Company or the Real Estate Land Title Trust Company were mortgage indenture trustees, were illegal.
 III. DIVERSIFICATION.
The trustees invested practically all of the funds of the smaller Elizabeth H. Avery, Quincy A. Gillmore, Jr., Frances West Hemsley Gillmore Williams and Frederick Hemsley Gillmore trusts in mortgages encumbering real estate in the general locality of Philadelphia, Pennsylvania. They suggest that such investments were diversified because improvements on the real estate were of different nature, i.e., business, residence, apartment, c. This is not the diversification adverted to in the rule requiring a distribution of assets.
The principle is stated in 2 Scott on Trusts 1229:
"The trustee should exercise prudence in diversifying investments so as to minimize the risk of large losses. He should not therefore invest more than a reasonable proportion of the trust estate in a single security, or, it would seem, in a single type of security. This is a common-place among experts in the art of making investments."
See, also, 3 Bogert, Trusts and Trustees 166; Restatement ofthe Law, Trusts 660.
The sole case in New Jersey is In re Ward, 121 N.J. Eq. 555;192 Atl. Rep. 68; affirmed, 121 N.J. Eq. 606;191 Atl. Rep. 772, where the court said:
"There is another and very important feature of this trust. The officers of the bank were well aware that one of the first *Page 41 
principles of safe investment is diversity in the type of investment and in the localities upon which these securities depend. Yet they invested the entire fund in securities of companies located in Essex County. None of the stocks were listed on any exchange, or were saleable outside the local market. Eighty per cent. of the fund was invested in the shares of banks dependent for their success on the continued prosperity of Newark and vicinity; nearly half the fund, in the stock of a single bank. The officers of the Trust Company, though acknowledging that safety demanded diversity, ignored the principle in practice."
These trusts, although heretofore referred to as "smaller" trusts, were of sufficient size and amount to warrant a greater diversification than was accomplished. The master suggested that a proper investment should not have exceeded a 25% allocation to mortgages. Under the facts here present, such a proportionate investment in mortgages would have been proper. A greater diversification could have resulted in a lower loss. As found by the master, to the extent of 25% of the corpus, the accountants will not be held liable for losses resulting solely from a failure to diversify. To that extent, such investments, in these four trusts which still remain in mortgages, are approved, but the accountants will be surcharged for any losses incurred from mortgage investments made in an amount in excess of said 25%.
 IV.
FAILURE TO COMPLY WITH STATUTORY REQUIREMENTS AS TO THE NATURE AND VALUE OF REAL ESTATE MORTGAGED.
It is unnecessary to consider the exceptions taken to the investment in participation certificates or real estate mortgage bonds under this heading, in view of the predetermination of their illegality. For the sake of brevity, the investments falling in this category are herewith described as follows: Erlanger Theatre, Social Service Building, 1001-03 Spring Garden Street, 49-61 West Lancaster Avenue and Montgomery Avenue and Gray's Lane. *Page 42 
In so far as the investment in the whole bond and mortgage where the real estate security was 660-62 North Broad Street, Philadelphia, Pennsylvania, is concerned, the testimony demonstrated that the original parcels at the time the mortgage was created were appraised by two experts. These appraisals were $150,000 and $157,000, respectively. The original loan was for $100,000. It is to be noted, however, that as security the trustees held not only the mortgage on this parcel of real estate but as well $10,000 in Liberty Bonds. The mortgage was not the sole security for this loan. A simple arithmetic calculation results in a conclusion that by crediting the Liberty Bond collateral against the total investment the amount loaned on mortgage security is within the statutory 60% of the value of the real estate. Under these circumstances, it cannot be said that the trustee violated the statute.
In so far as 1534-42 Wood Street is concerned, the parcels at the time of the placing of this mortgage were appraised respectively at $115,000 and $120,000. The mortgage loan was for $65,000. I am satisfied with the appraisals made at the time of this loan and that the mortgage, when placed, was not in excess of the maximum 60% provided by the statute.
The two latter mortgages, i.e., 660-62 North Broad Street, and 1534-42 Wood Street, appraised respectively in 1926-1928, show the difficulty which must be encountered in attempting to determine value where upwards of 20 years has elapsed since the original appraisal and loan. I am satisfied that the trustee had obtained able, honest and conscientious appraisers prior to placing these loans and that their appraisal of the then value of the real estate should stand. Whether consciously or unconsciously, the lapse of time and the changing conditions must color the opinion of appraisers, regardless of how able and conscientious they may be, who attempt to establish the value of real estate twenty years subsequent to the investment. This is particularly true when it is recalled that during the years with which we are here concerned, we experienced not only the unprecedented boom of the 1920's but also the unprecedented depression of the 1930's. *Page 43 
I am also satisfied that the nature of the real estate of these investments met the statutory requirement.
Exceptants' objections to the investments under this heading are without merit.
 V. ESTOPPEL.
As a general defense, the accountant has advanced the theory that the exceptants are estopped from questioning the disputed investments. The basis for such contention finds its foundation in the allegation that the exceptants, with full knowledge, either approved such investments by implication, or slept upon their rights in not contesting them.
In McAllister v. McAllister, 120 N.J. Eq. 407;184 Atl. Rep. 723, this court cited with approval White v. Sherman,168 Ill. 589; 48 N.E. Rep. 128, where the court said:
"In order to bind a cestui que trust by acquiescence in a breach of trust by the trustee, it must appear that the cestuique trust knew all the facts, and was apprised of his legal rights, and was under no disability to assert them. Such proof must be full and satisfactory. The cestui que trust must be shown, in such case, to have acted freely, deliberately, and advisedly, with the intention of confirming a transaction which he knew, or might or ought, with reasonable or proper diligence, to have known, to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which is material for him to know. He cannot be held to have recognized the validity of a particular investment unless the question as to such validity appears to have come before him."
See, also, Gates v. Plainfield Trust Co., 121 N.J. Eq. 460;191 Atl. Rep. 304; Rothenberg v. Franklin Washington Trust Co.,127 N.J. Eq. 406; 13 Atl. Rep. 2d 667; In re Shaw, 122 N.J. Eq. 536; 195 Atl. Rep. 525.
To imply acquiescence it must appear that the cestui quetrust knew all of the facts, understood his legal rights and *Page 44 
acted deliberately in not objecting to an investment to which he knew, or should have known that he had a right to object.
In view of the conclusion on the exceptions as hereinbefore set forth, it becomes unnecessary to consider this phase of the case, except as it may be related to the participation certificates or mortgage bonds, and the failure to diversify.
The question of the legality of investments in such participation certificates or mortgage bonds depends upon a compliance with the New Jersey statutes which permit fiduciaries to invest in such securities. The question of the legality of these participation certificates and mortgage bonds turns upon an interpretation of the statutory requirement that the mortgages against which they are issued shall be held by a trust company or bank authorized to do business in New Jersey. At no time did the accountant disclose that it had not complied with the New Jersey statute providing for authority to transact business in New Jersey. Not only was there no such disclosure of the absence of what we conceive was authority to do business in New Jersey, but the accountant has submitted long and vigorous argument in support of its contention that it had complied with the statutory requirement, even though it failed to obtain a certificate of authority to do business from the Secretary of State. The present litigation has resulted in the first adjudication of the status of foreign banking corporations issuing participation certificates without having obtained a permit or license to do business in New Jersey. It is plain that it cannot be said that the exceptants knew of the legal invalidity in the face of accountant's own sincere exposition of its claim that its failure to obtain a certificate was not a prerequisite for authority to do business in this State. There is no proof that the exceptants knew their legal rights and acted deliberately in not objecting to the questioned investments.
The transactions are here deemed improper because they are contrary to the express specific direction of the statute. There is in existence a mandatory statutory edict which cannot be ignored by the fiduciary with impunity. It is incumbent upon it to obey. Immediately upon its failure to comply there is such a breach or violation of its duty as to give rise *Page 45 
to personal liability. The investments are illegal from their inception. The trustee was bound to observe the statutory edict and cannot escape liability by an implied consent of the beneficiaries. There is here absent any question of prudence, good faith, motive or integrity of the trustee. The trustee had no discretion to exercise. We are confronted with a question relating solely to a compliance with a narrow and fixed standard, capable within narrow confines of determination. The legality of the investment is capable of predetermination. If the investment is illegal for failure to comply with the statute it is illegalab initio and no implied acquiescence can infuse legality into the transaction by way of waiver or estoppel.
Since the accountant has failed to show a complete knowledge of the facts by the exceptants and a knowledge of their legal rights to give rise to an implied acquiescence, and since they have also failed to demonstrate an actual acquiescence, which is here required to excuse their conduct, they fail in this defense.
In further connection with this defense in so far as it relates to both a surcharge predicated upon investments in mortgage participation and mortgage bonds and a failure to diversify such investments, it must be remembered that no formal account was filed in any of the courts of this State from 1915 to 1944,i.e., for approximately 29 years. Quincy A. Gillmore, Jr., one of the remaindermen, demanded that such an account be filed in 1942. There was no forum in which exceptants could have objected to such investments without initiating the proceedings themselves. We are not concerned with res adjudicata as an estoppel. The remaindermen apparent in the residuary trust are Quincy A. Gillmore, Jr., Frances Gillmore Williams and Frederick H. Gillmore. The earliest date that Quincy A. Gillmore, Jr., is alleged to have had knowledge of these investments is 1934 and Frederick H. Gillmore in 1939. Frances Gillmore Williams was shown to have had knowledge of only one investment and that in 1936. No other personal knowledge can be attributed to these parties prior to the above dates. The attempt to show an agency for them failed in vital respects. *Page 46 
There is no proof of any personal knowledge of the investments conceived to be illegal by any of the life tenants or remaindermen of the four smaller trusts. As a matter of fact, there are in existence contingent infant remaindermen in the three trusts created for the grandchildren of the creator whose disability because of their minority bars the consideration of the defenses of estoppel or waiver.
The accountants have failed to present testimony exhibiting that they were fully informed and thoroughly understood the nature of the illegal investments and that they knew their legal rights. See Rothenberg v. Franklin Washington Trust Co.,127 N.J. Eq. 406; 13 Atl. Rep. 2d 667; Pike v. Camden TrustCo., 128 N.J. Eq. 414; 16 Atl. Rep. 2d 634; Ross v.Savings Investment and Trust Co., 120 N.J. Eq. 87;184 Atl. Rep. 183. There was no actual affirmative approval and accountants have failed to carry the burden required for implied acquiescence. The defense advanced is without merit as to the investment in mortgage participation certificates and mortgage bonds and for a failure to diversify the investments.
 VI. MOTIVE OF THE TRUSTEE AND PROFIT ON THE TRUST AS A WHOLE.
The accountant has argued that it should not be surcharged because breaches of its duty, if any existed, were purely technical breaches, and further, that the administration of the estate as a whole shows a profit.
It is a well-recognized rule that a trustee is not responsible for mere mistakes. The court expressed this in In re Griggs,125 N.J. Eq. 73; 4 Atl. Rep. 2d 59, as follows:
"All that the law exacted of our trustee in the administration of its stewardship was an obligation of faithfulness to thecestui and a duty to exercise ordinary care, prudence and diligence. Smith v. Jones, 89 N.J. Eq. 502;104 Atl. Rep. 380. So long as it acted in good faith, with ordinary care, *Page 47 
caution and discretion and within the scope of its powers, our trustee cannot, and will not, be held liable for the consequence of its mere mistakes, even if such there were, resulting from mere errors of judgment and not proceeding from any fraud, gross carelessness or indifference to duty on its part. Monroe v.Osborne, 43 N.J. Eq. 248; 10 Atl. Rep. 267; Heisler v. Sharp,44 N.J. Eq. 167; 14 Atl. Rep. 624; affirmed, 45 N.J. Eq. 367;19 Atl. Rep. 621; In re Leonard, 107 N.J. Eq. 235;152 Atl. Rep. 243; In re Corn Exchange National Bank, 109 N.J. Eq. 169;156 Atl. Rep. 455."
However, we are here confronted with surcharges which find their foundation either in a clear disregard of the statutory mandate in connection with the investment in participation certificates and mortgage bonds, or in a failure to diversify. The former exhibits an action beyond the scope of its powers and the latter an action not consistent with ordinary care, caution and discretion. Neither of these acts can be classed as "mere mistakes" and neither is a simple technical breach. They constitute that failure to comply with the duties of a fiduciary as must result in a surcharge.
The answer to the argument that a profit was made for the trusts generally, in spite of any dereliction in duty is found inRestatement of the Law, Trusts (at p. 593):
"A trustee who is liable for a loss occasioned by one breach of trust cannot reduce the amount of his liability by deducting the amount of a gain which has accrued through another and distinct breach of trust; but if the two breaches of trust are not distinct, the trustee is accountable only for the net gain or chargeable only with the net loss resulting therefrom."
And again (at p. 595):
"If the trustee is liable for a loss occasioned by a breach of trust in respect of one portion of the trust property, he cannot reduce the amount of his liability by deducting the amount of gain which has accrued with respect to another part of the trust property through another and distinct transaction which is not a breach of trust."
Accountant's defense under this heading is without merit. *Page 48 
 VII. INTEREST.
Exceptions to interest as allowed by the master have been taken by both the exceptants and the accountants. The master allowed a flat 4% on the total principal of all investments which he found illegal. The exceptants contend that one of several other methods of computation should be employed, and the accountant that no interest charge should be allowed.
Since the accountant has been held to have violated the express direction of the statute in so far as the participation certificates and mortgage bond investments are concerned, it follows that it violated a duty expressly imposed upon it. The statutes governing the investments made by fiduciaries are mandatory, Gates v. Plainfield Trust Co., 121 N.J. Eq. 460;191 Atl. Rep. 304; affirmed, 122 N.J. Eq. 366;194 Atl. Rep. 65, for the protection of cestuis and remaindermen and the guidance of fiduciaries. The rationale of these requirements is to afford the greatest degree of safety possible for those for whose benefit the fiduciaries act. If a fiduciary takes it upon himself to ignore the statutory dictate he does so at his own peril. If a greater return is had on an "illegal" or "non-legal" investment than would have been had on a "legal" investment, there is, of course, normally no complaint from the cestuis. On the other hand, there is always the danger of a loss. That being so, the cestuis and remaindermen are entitled to all profits which may be received from an illegal investment. To hold otherwise would, in effect, permit a trustee to speculate with trust funds and if the speculation were profitable, to receive the benefit of such disregard of the statutory mandate and violation of his duty. It is conceivable under a given set of facts that a trustee could make a profit unless the general principle hereafter set forth for computing interest were adopted. It is academic that a trustee is never permitted to make a profit from the trust estate. *Page 49 
There is here present no allegation of active bad faith nor gross misconduct. The trustee had no authority to exercise its judgment concerning the participation certificates and mortgage bonds, and is not liable because of the error of such judgment. In this respect the statute superimposed its judgment in specifying what were legal investments. In so far as the charge of lack of diversification is concerned, the trustee is liable because of a failure to exercise that degree of care, caution and discretion required of it.
The accountant's argument that the charge for interest is in the nature of a punishment or penalty, and that in the absence of bad faith it should not be punished, is without merit.
For gross misconduct as distinguished from mere neglect of duty, except where the latter may consist of an improper investment in a trade or a speculative investment, a trustee may be held liable for the profits therefrom or for compound interest on the initial investment. Clark v. Clark, 87 N.J. Eq. 504;101 Atl. Rep. 300; Windmuller v. Spirits Distributing Co.,83 N.J. Eq. 6; 90 Atl. Rep. 249; McKnight's Executors v. Walsh,23 N.J. Eq. 136; Frey v. Administrators of Frey, 17 N.J. Eq. 71.
The general rule is very tersely stated in Restatement of theLaw, Trusts 566, as follows:
"Where the trustee commits a breach of trust and thereby incurs a liability for a certain amount of money with interest thereon, he is chargeable with interest at the legal rate or such other rate as the court in its sound discretion may determine, but in any event he is chargeable with interest actually received by him or which he should have received."
See, also, 2 Scott on Trusts 1107.
As above stated, there is here an absence of gross misconduct. The element of trade investment or speculation is likewise not present. To impose the maximum legal rate of interest might be considered punitive. The rate of interest should be as nearly as we can determine the rate which the fiduciary should have obtained during its management from legal investments properly diversified. *Page 50 
The rule adopted by Vice-Ordinary Jayne in In re Ebert,136 N.J. Eq. 123; 40 Atl. Rep. 2d 805, seems particularly apt here. In this case he said:
"Compensation should also develop the consequential loss of income and accordingly the respondent is chargeable with interest. The rate, however, should be one that is equitable in the evident conditions and circumstances of the particular case. The beneficiaries are entitled to such method of calculation as shall most closely approximate the amount which would in reasonable probability have been obtained by a proper fulfillment of the duties of the trustee. Mindful that the trust fortunately received, though belatedly, a liberal return of six per cent. until April 1st, 1930, and that there is neither charge nor proof of bad faith on the part of the respondent, the surcharge will include simple interest at three and one-half per centum on the principal fund of $7,000 from April 1st, 1930."
See, also, Fowler v. Colt, 22 N.J. Eq. 44.
Each investment made by accountant contrary to the express directions of the statute, constituted a separate violation of its terms. The investments should, therefore, be considered separately. 3 Bogert's Trusts and Trustees part 2 p. 433;Restatement of the Law, Trusts 593. This is as well true of each investment made without proper diversification, on the basis hereinbefore set forth.
On each investment illegally made, the trustee should be charged for the amount of income actually collected but in no event at a rate of simple interest less than 4% per annum. The trustee shall also be charged on each such investment where no income was produced, simple interest at the rate of 4% per annum for the period of such failure to produce income.
It is not necessary to consider the other attacks of exceptants upon the conduct of the accountant, since the investments objected to have been held illegal on other grounds.
The balance of the exceptions by both exceptants and accountants are unnecessary of express further conclusion as they are generally encompassed in the foregoing. *Page 51 
 VIII. COUNSEL FEES AND COMMISSIONS.
The trustee's conduct here was not willfully wrong. There is here no proof of fraud or gross misconduct. Under these circumstances, the accountant is entitled to commissions and counsel fees in connection with the management of the estate.Babbitt v. Fidelity Trust Co., 72 N.J. Eq. 745;66 Atl. Rep. 1076.
Costs and counsel fees arising out of the present proceedings should be borne by the trustee. It was as a result of its fault that it was surcharged and these proceedings were necessitated.
The language employed in In re Johnston, 127 N.J. Eq. 576;14 Atl. Rep. 2d 469, is applicable here. The court there said:
"As to counsel fees assessed against the trustee, as well as master's fees and stenographic costs, the decree below should be affirmed. The necessity for these expenditures arose out of the misconception of the trustee as to its duty with reference to its investments and through no fault on the part of the cestui."
The report of the special master is, therefore, in all the matters and things therein set forth, approved and confirmed, with the exception of his findings concerning interest, fees and commissions, which determination is modified as above set forth. The balance of the exceptions taken to his report are disallowed. *Page 52