Monroe v. Osborne.

DAVID MONROE, appellant,

*v.*

EMMA OSBORNE, respondent.

Taking a second mortgage by a special guardian appointed for the sale of infants' lands, by a subsequent change of investment, is not approved; but it is not necessarily a breach of trust. Each case must stand on its own circumstances, and ordinary care and prudence must be shown.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following opinion:

I have given this case the fullest consideration, in the hope of being able to see my way clear to protect the defendant from the charges of the complainant, and at the same time to do complete justice to the complainant, who, at the time of the transactions complained of, was an infant and the ward of the defendant, Monroe. I say this because I believe that the defendant, Monroe, acted in good faith. But I must remember that, unless the case be a clear one, the infant, who was innocent, ought not to suffer loss, even though there may be some doubt as to the extent of that loss. As the case is considered, all will agree that the com-

Monroe *v.* Osborne.

plainant has the very highest claims upon the regard and watchfulness of the court.

In 1868, Monroe and Snyder, as guardians, under the direction of this court, sold the lands of Mrs. Osborne and Mrs. Lantz, then infants, for $5,496.15. They received, in cash, $1,000.15, and bonds and mortgages for $4,496. The mortgages were on the property conveyed. Of this amount $1,832 was set apart and secured, that the interest might be paid to the widow during her life; the interest on the balance, $2,664, was to be paid to Monroe and Snyder. And the whole $2,664 was to be paid in equal portions to Mrs. Osborne and Mrs. Lantz, as they arrived at age, and the $1,832 was also to be paid to them on the death of the widow, if she survived their arriving at age, and if not, when they did arrive at age. The interest was fully paid, and in 1875 $1,164 was paid on the principal, thus reducing the encumbrance from $4,496 to $3,332. This payment was made and endorsed on the bond and mortgage, which secured the amount of the purchase-money payable to Mrs. Osborne and Mrs. Lantz as they came of age, leaving due thereon $1,500. Snyder, one of the guardians, having died, Monroe, as surviving guardian, took a new mortgage of that date (1875) from the then owner of the premises for the $1,832, and assigned the other mortgage to Cole for $1,500. He thus voluntarily surrendered the first lien and lost all control thereof, and made the other mortgage a second lien. The interest was paid on the Cole mortgage until 1877, and not being paid thereafter, it was foreclosed. The lands were sold for $1,500. Thus the balance, $1,832, due to Monroe, as guardian, is lost, unless Monroe is personally liable. The bill seeks to charge him with such liability. His bondsmen are brought in.

The answer avers good faith. Monroe swears that he acted not only in good faith but under the advice of his counsel. The argument in behalf of Monroe is that, although the money was well secured in 1868, yet, long before it became due, there was such depreciation in values that the security was doubtful, and that this was so notwithstanding the payment of $1,164 in 1875. This being so, it is said that the sale and assignment to Cole of

the old mortgage for $1,500 and securing to him a preference over the mortgage for $1,832, by taking a new mortgage for that amount, did not alter or affect the rights of Monroe as guardian, or of his ward, since he had the same security that he held before; that is, altering the securities did not increase or diminish the value of the land.

This, perhaps, is the turning point in the case. Were not his rights and interest as a guardian affected and altered by this surrender and change of securities, notwithstanding the value of the land remained the same? It is true the same amount and no more remained as a lien upon the premises. But was it of no value to have the control of the first mortgage? Do not all business men seek such control? Is it of no value to be able to say whether, in such case, there shall be a foreclosure or not, and a sale or not? Has not many a doubtful claim been satisfied in full by prudence and good management? Manifestly it is of great value to have control of the first mortgage. But it is said the court must judge of these things by results; that in this case the premises were offered at public sale by the sheriff, and that every effort was made to secure the highest price, and that they sold for only $1,500, having sold, nine years before, for $5,496. Yes, it is true that the course pursued produced such a result. But, accepting this method of reasoning, it will at once appear most unfortunate that we know not and cannot know what would have resulted had the guardian retained his securities and foreclosed (if that became necessary) on his own account, or had called upon this court, whence he derived his authority, for instructions and aid in the matter. When courts of equity are asked to accept results, and to ratify them, it must appear very clearly that the result reached is the most favorable. If there exists a reasonable probability that a different course might have secured a more advantageous result, I cannot understand how a court of conscience can close its eyes to such fact, and relieve a trustee from liability, and cast the loss on an innocent *cestui que trust*. It seems to me that the reasoning of defendant's counsel is fallacious, and to stand upon it would be an abuse of a very salutary rule.

But is there not a most reasonable probability—indeed, do not the facts show—that very much more than $1,500 might have been realized on this security had Monroe retained the original lien intact ? Just group the principal facts, and consider whether or not they do not so strike the understanding with unremitting force, turn them as one will. The lands were sold for $5,496 ; $1,000 had been paid in cash; Monroe and Snyder, two able, competent and interested men, under the obligations of an oath, and in full view of their legal and moral obligations, accepted mortgages for the balance ($4,496) on the land sold ; the interest was paid until 1875, when $1,164 more of the principal was paid, leaving only $3,332 still due; it was necessary to realize a trifle over $33 per acre (there being ninety-nine ninety-three hundredths acres) to secure the balance due, for lands which they had sold for $54 per acre; Monroe allowed this same tract to be sold for $1,500 ; and at the time of that sale, it is shown by the witnesses called by Monroe that it was worth from $2,000 to $2,500. Hence, that this result would have been different, under a wise management by the guardian himself, is placed beyond speculation. With such a showing, can any court justify the guardian and say that his ward should bear the loss rather than he ? I conclude not.

The charge is made in the bill that, in making this change of securities, the guardian acted in his own interest and not in that of the ward, which, it is claimed, is shown by the fact that he used the money received from Cole to answer his own personal ends. Monroe does not meet this charge in his answer, and in his evidence he supports the charge by saying that he thinks he did not use it all. This fact tends very strongly to raise the belief that he was acting more in his own behalf than in his wards'.

Again, the guardian makes an effort to excuse his conduct and fix the responsibility for the present situation by showing that he made investments of money in a house and lot, at the request of his wards and their grandmother, that they might have a home together, at an expense of about $1,500, which the infants promised to accept a deed for on arriving at age; but which they

now refuse to do. Such transactions, however honest and well meant, are wholly unavailing. And this circumstance is only an additional proof of the great wisdom of the rule which seldom, if ever, tolerates any such dealings between guardian and ward. without the sanction of the court first being had.

I will advise a decree according to the prayer of the bill, with costs.

*Mr. Thomas Kays*, for appellant.

*Mr. M. Rosenkrans* and *Mr. John Linn*, for respondent.

The opinion of the court was delivered by

SCUDDER, J.

The bill in this case is filed to compel David Monroe, a special guardian appointed by the court of chancery, under the statute, to sell the lands of the complainant and her sister, who were infants, and his sureties to pay to the complainant the sum of $916, her one-half share of a bond and mortgage for $1,832 given to secure a part of the purchase-money. The money secured by this mortgage, the complainant charges, has been lost by the breach of trust of the defendant, who has survived John Snyder, his associate guardian, and since his death has changed the security held by them as guardians for the benefit of herself and sister, Mary Frances Lantz. The land, which was a farm of about one hundred acres, was sold to John Van Blarcom for $5,496, and the sale was reported to and confirmed by the chancellor. Of this purchase-money $1,000 was paid in cash, and the balance—$4,496—was secured by mortgage on the conveyed land, dated May 5th, 1868. This mortgage included the value of the dower right of Elizabeth Maines, the grandmother of the infants, amounting to $1,832. After her death, on March 24th, 1883, these granddaughters became entitled to these $1,832, which had been invested for her benefit during her life. In 1869, Van Blarcom conveyed nine acres of this farm to one John Anderson, and in 1870 sold and conveyed the balance to

Monroe *v.* Osborne.

Jacob B. Hagaman, subject to the mortgage for $4,496 held by the guardian, which Hagaman assumed to pay, as part of the purchase-money.

Hagaman paid, at different times, $1,164 on account of the principal of the bond and mortgage, besides the interest, reducing the principal sum to $3,332. On May 7th, 1875, Monroe endorsed this payment of $1,164 on Van Blarcom's bond, also the $1,832 invested for Elizabeth Maines's dower right, leaving a balance of $1,500 due on the bond and mortgage, and in this form assigned the Van Blarcom bond and mortgage to one Joseph Cole for $1,500.

On the same date, May 7th, 1875, another bond and mortgage on the same premises were given by Jacob B. Hagaman to David Monroe, as guardian, for $1,832, the sum representing the dower right of Elizabeth Maines. The effect of this change of the security was to postpone payment of the $1,832 mortgage given by Hagaman until the $1,500 due on the Van Blarcom mortgage was first paid to Cole or his representatives. This is the breach of trust of which complaint is made in this bill and upon which the liability of the special guardian is founded. It is said that he voluntarily gave up the prior security and took a second mortgage for the $1,832 and thereby assumed the risk of its loss. Second mortgages on lands as securities for trust funds have been regarded as improper and questionable investments, not necessarily wrong and conclusive on a charge of breach of trust, but sufficient to cast on the trustee the burden of satisfactorily showing that his act was prudent or unavoidable under the circumstances. *Tuttle* v. *Gilmore, 5 Stew. Eq. 611 ; S. C., 9 Stew. Eq. 617.*

Each case must, however, stand on its own circumstances, and a general rule, applicable to all cases, is that a trustee must use the same care, skill, diligence and prudence in the management of the trust and his dealings with the trust property which a man of ordinary care, skill and prudence would use in his own transactions and with his own property under like circumstances. In assuming the duties of an ordinary trusteeship, where he is not controlled by statutes, rules of court or provisions in a deed

or will, a trustee is not bound to extraordinary care, nor is he an insurer against loss under all circumstances, but if he is careful, faithful and discreet, the duty imposed on him by law will be discharged. *Clark* v. *Garfield, 8 Allen 427; Hun* v. *Cary, 82 N. Y. 65; 2 Pom. Eq.* § *1070 &c.*

In applying this rule to the facts of this case, we notice that a large proportion of the purchase-money was invested by the guardians with the order and approval of the court directing the sale of the land and the investment of the proceeds; that there has been a gradual reduction of the principal sum invested from $4,496 to $3,332; that all the money received for principal and interest has been accounted for; that after the guardian had obtained $1,500 by disposing of a portion of the security held by him, the balance, $1,832, remained charged on the same lands with no greater burden than they had previously borne; that payments were made thereby in the order of priority named in the bond: first, those that were due or to become due to the infants when they attained the age of twenty-one years (Mrs. Osborne, the complainant, being of that age November 11th, 1876, and Mrs. Lantz about three years earlier), while the share represented by their grandmother's interest did not become due until her death, March 24th, 1883. The difference of which complaint is made is that, instead of retaining the mortgage for the whole amount, the guardian divided it into two portions, giving the person who had advanced a part the preference for re-payment out of the trust security. This was effected in the form of a second mortgage on the land which would have been no prejudice to the trust fund if both securities were in the hands or under the control of the guardian. But if with both securities, or the former bond and mortgage for $3,332 in hand, the trustee would fail in recovering the whole amount of the trust funds, because of the depreciation in the value of the property and the insolvency of the purchaser of the land, he could not be held accountable for the loss, unless by prompt action he might have saved the fund.

The reasons that the trustee gives for the change made in the security were that he had, at the time, advanced about $700 to

these young ladies, as they had required money from time to time; that he had need for the money; that he called on Hagaman, to whom Van Blarcom had conveyed the farm, to help him with the payment; that he suggested to get some one who would take the mortgage and give him more time, and acting on this suggestion, he saw Joseph Cole, with whom he made the arrangement above described. He further says that he considered the bond of Hagaman better than the bond of Van Blarcom, who was insolvent and had gone away, abandoning his family. But admitting that the guardian had violated his duty, technically, in making a change of the security held by him, he can only be made to account for the value of such security, or the loss which the complainant has sustained. Wherever a *prima facie* case of misconduct is made out against trustees, the complainants are entitled to a decree that they shall account for whatever they might have received without such willful default or neglect. *Hill on Trustees 523*. The investment in this case was not made by the trustee or guardian originally on his own responsibility, but by the order and approval of the court, and it does not appear that he could at any time have obtained payment of it and a better security. The evidence clearly shows that the land was very poor and unproductive. It is described as limestone, slate and clay, with a very thin covering of soil. The buildings had never been painted and were of little value. It is evident that the original sale was made at a price far beyond its real value and at a time when the price of such land was much higher than it has been at any time since. The witnesses who live nearest to the farm and best understood its value say that when sold originally lands were high, and that this property has greatly depreciated in value; that at the present time it is not worth more than from $2,000 to $2,500. After Mr. Cole's death, the entire property was sold under a foreclosure of the mortgage, in March, 1879, by his executor, for $1,600; the whole amount due for principal, interest, costs and expenses was $1,911.18. After holding the property for three or four years, and with constant effort to sell at private sale, it was sold for $1,500 by the counsel for the estate,

who testified that that was all that could be obtained for it. The widow received interest for her dower up to her death. The three several amounts paid on account of the principal sum and purchase price for the farm make a total of $3,644 received by the guardians and accounted for by them to their wards. Mere speculation as to what would have been the result if the guardian had made further advances, delayed a sale, and himself assumed the risk of the expenses of foreclosure and purchase of the property, will not avail to charge him with a breach of trust in failing to secure the full purchase price of the land. The evidence does not show that it was practicable, with ordinary care and diligence, for the guardians to get more out of the land and the securities held by them than they did. The bill should be dismissed, and the decree reversed, with costs.

*Decree unanimously reversed.*