Gustavus C. Seidel died on September 23d 1922, leaving a last will and testament in which appeared the following provisions:
"Third: I give and bequeath to the Liberty Title and Trust Company, its successors and assigns, the sum of Two Hundred and Fifty Thousand Dollars, in trust, nevertheless, for the following uses and purposes, namely; to invest and reinvest the same, changing said securities according to their best judgment and to collect the rents, issues and profits thereof and after the payment of necessary charges and expenses to pay the net income thereof, quarterly, to my wife Lillian W. Seidel, in quarterly installments, for and during all the term of her natural life. At and immediately upon the decease of my said wife, Lillian W. Seidel, I direct that the sum of One Hundred and Fifty Thousand Dollars shall be paid by my said Trustee to such person or persons and for such trusts as my said wife shall, by her last will and testament direct and provide, and the remaining One Hundred Thousand Dollars I direct shall go to and become a part of my residuary estate, to be paid to and distributed among the same persons as are entitled to my said residuary estate under the provisions of this will."
"Twentieth: All the rest, residue and remainder of my estate, of whatsoever the same may consist and wheresoever situate, whether real, personal or mixed, I give, devise and bequeath unto my nieces, Louise Plews, Lillian Welzel and Vera Welzel in equal shares absolutely, their heirs and assigns."
"Twenty-second: Neither my said Executors nor Trustees shall at any time be liable for any depreciation in the value of any of my investments nor shall the retaining of said investments by my said Executors or said Trustees be held or construed at any time to be negligence by them or any of them no matter what may be the depreciation in the value of any of said investments or the change in their market prices."
"Twenty-fourth: I give to my Executors and also to the Trustees under every trust created by this will the following powers in addition to and not in diminution of the powers incident to their office, viz:
"b. To retain any investments I may have at my death and from time to time to invest in such securities including in that term well secured ground rents, either within or without the State of Pennsylvania as they may deem safe and proper, but without confining them to what are technically known as legal investments."
This will was duly probated, after an appeal, on April 4th, 1923. In accordance with the provisions of said will, the trust above referred to was duly set up on September 26th, *Page 496 
1923. The first account of the trustees was filed on May 27th, 1932, and was allowed and confirmed by a decree of the Orphans Court on December 24th, 1932. Lillian W. Seidel having died May 14th, 1944, the final account was filed herein on February 6th, 1945, in the Orphans Court of Atlantic County. To this account various exceptions were taken.
After a prolonged trial before the present Vice-Chancellor, who was then the Judge of the Orphans Court of Atlantic County, briefs were finally filed. The case was thus in complete position for final adjudication shortly before the appointment of the writer to the Chancery Bench, but the intervening time did not permit of final disposition. Thereafter, by consent of all parties, the matter was transferred to the Court of Chancery, with the stipulation that the testimony taken before the Orphans Court should be used in the Court of Chancery. The case was so removed by reason of the inherent authority of the Court of Chancery to determine probate matters.
The exceptions common to all of the exceptants, when finally analyzed, complain of the conduct of the trustee in that (1) it made improper, imprudent and illegal investments; (2) it carelessly and improperly managed the investments included in the trust; (3) it retained certain investments received from testator which it should have liquidated; (4) it failed to properly diversify investments.
The following exceptants, Joseph W. Wells, Harry L. Wells, William L. Lovett, Viola Lovett, Arthur H. Leigh, Arthur Leigh, Ellen Leigh, William L. Leigh, Annie C. Ross, James Stuckey, Maud Seidel, Maria Lewis, Iona Busch, individually and Iona Busch, as executrix and trustee of the last will and testament of Lillian W. Seidel, Harry Fort Busch, and Lillian Emily Wells and Patricia Anna Wells, minors, by their guardian ad litem, Augustine A. Repetto, in addition except to the account in that it is alleged that the accountant, from July 2d 1934, to June 13th, 1944, at various times made charges to income for expenditures which should have been properly charged as against the corpus of said estate. These exceptants are the executrix and appointees of Lillian W. *Page 497 
Seidel. They contend that the apportionment made by the accountant was improper. In this there is a contest not only between the accountant and these exceptants but between the latter and the other exceptants as well.
For the purpose of clarity in so far as the exceptions are concerned which are common to all of the exceptants, the various parties so excepting will be referred to as the "exceptants" and the trustee, i.e., the Liberty Title and Trust Company, will be referred to as the "accountant."
The accountant advances several theories upon which it defends the investments to which exceptions have been taken. These are as follows: (1) Res adjudicata predicated upon a decree of the Orphans Court dated December 24th, 1932, approving a prior accounting; (2) estoppel predicated upon an alleged knowledge of the exceptants of the investments complained of and acquiescence by them; (3) exoneration predicated upon the provision of the will of Gustavus C. Seidel, and (4) legal, faithful and intelligent discharge of its duties and obligations in making or retaining the questioned investments.
Before ascertaining whether it is necessary to consider the exceptions herein taken, it is, of course, essential as a preface, to consider the first three above referred to defenses. Said defenses will, therefore, be considered in the order above set forth.
 I. RES ADJUDICATA.
On May 27th, 1932, the first and sole accounting prior to the present final account was filed by this trustee. To this account Lillian W. Seidel, the life tenant, and Louise Plews, remainderman, took exceptions. In addition to Louise Plews, the designated remaindermen were Vera W. Gentsch and Lillian M. Welzel, both of whom contested the exceptions filed by Lillian W. Seidel. Lillian W. Seidel's exceptions were generally directed to that part of the account which showed accretion to corpus
received as a profit from the sale of certain securities, contending that said sum so received constituted *Page 498 
income earned by the trust estate and should have been paid to her. Louise Plews' exceptions are directed toward the expressed inventory value of securities held by the trustee as of the date of the filing of the account, to the payment to the said Lillian W. Seidel of various sums which it is alleged did not constitute income, but were corpus accretions, and to certain charges against corpus. The questions here raised were not before the court at that time. The plea of res adjudicata is advanced, not because the particular questions now sought to be litigated were actually raised and adjudicated, but because they could have been raised by these exceptants and then litigated, but that they failed so to do.
It is, of course, recognized that the present exceptants may be estopped, upon the principle of res adjudicata, from now questioning any investments made before the date of the decree approving the prior accounting, upon a proper case made. SeePollack v. Bowman, 139 N.J. Eq. 47; 49 Atl. Rep. 2d 40.
In recent years the three leading cases in connection with the effectiveness of a decree approving an account with a list of securities annexed to estop interested parties from thereafter contesting the propriety or the validity of investments made or retained by a fiduciary upon the theory of res adjudicata, areIn re Shaw, 122 N.J. Eq. 536; 195 Atl. Rep. 525; Pollack v.Bowman, supra, and Dickerson v. Camden Trust Co., 140 N.J. Eq. 34; 53 Atl. Rep. 2d 225. These three authorities deal with distinct and distinguishable sets of facts. From these authorities it is clear that an Orphans Court decree approving an account is not in and of itself effective to bar any subsequent complaint about the management of the estate. It is self-evident that an intermediate decree of the Orphans Court approving an account does not ipso facto act as a bar to prevent cestuis
from subsequently questioning any act of a fiduciary where his conduct was not litigated at the time of such decree. To accord such a decree such an effect, the basis of the exceptions, as well as the list of securities, the disclosures contained in the account as filed and the nature of the exceptions now under consideration must be analyzed. Exceptions may be taken to any account for a *Page 499 
number of reasons, i.e., fraud of the fiduciary, self-dealing by the fiduciary, illegality of a particular investment predicated upon a failure to comply with the statutory mandate, failure of the fiduciary to exercise the requisite degree of care and prudence, and other grounds not here necessary to be cataloged.
Each of the foregoing specified exceptions is grounded upon a different state of facts. A statement of assets attached to an intermediate account would not of necessity disclose the fraud, self-dealing or illegality related to the conduct of a fiduciary in his management of an estate, nor serve to put a beneficiary upon notice thereof. It is, of course, desirable that a fiduciary receive the protection here sought where he has openly disclosed all of his acts to the cestuis. However, it ill behooves a fiduciary to seek by estoppel of judgment to prevent a cestui
from questioning his fraudulent or illegal acts, where they have been concealed from or not disclosed to the cestuis, and where such estoppel arises from a failure to litigate his now contested conduct.
It would appear that in any event, and in each case, in order to obtain that repose to which the fiduciary here feels itself of right entitled, the fiduciary should be required to make a full and complete disclosure of pertinent investment facts.
In McAllister v. McAllister, 120 N.J. Eq. 407;184 Atl. Rep. 723, this court cited with approval White v. Sherman,168 Ill. 589; 48 N.E. Rep. 128, where the court said:
"In order to bind a cestui que trust by acquiescence in a breach of trust by the trustee, it must appear that the cestuique trust knew all the facts, and was apprised of his legalrights, and was under no disability to assert them. Such proofmust be full and satisfactory. The cestui que trust must be shown, in such case, to have acted freely, deliberately, and advisedly with the intention of confirming a transaction whichhe knew, or might or ought, with reasonable or proper diligence,to have known, to be impeachable. His acquiescence amounts to nothing if his right to impeach is concealed from him, or if a free disclosure is not made to him of every circumstance which is material for him to know. He cannot *Page 500 
be held to have recognized the validity of a particular investment unless the question as to such validity appears to have come before him."
See, also, Rothenberg v. Franklin Washington Trust Co.,127 N.J. Eq. 406; 13 Atl. Rep. 2d 667; In re Shaw, supra;Gates v. Plainfield Trust Co., 121 N.J. Eq. 460;191 Atl. Rep. 304; Pike v. Camden Trust Co., 128 N.J. Eq. 414; 16 Atl. Rep.
2d 634; Dickerson v. Camden Trust Co., supra.
In Pollack v. Bowman, supra, upon which accountant's argument principally rests, the Court of Errors and Appeals held that where a statement of assets required by the Orphans Court rule is attached to an account, that any interested party desiring to do so, must make a timely objection to any item or items shown on the statement. The court there held that there having been no objection at any time when seven prior accounts were filed and approved, that the exceptants were then estopped by such prior adjudication. It is also to be noted that inPollack v. Bowman, supra, the Court of Errors and Appeals referred to the facts as set forth in Pollack v. Bowman,23 N.J. Mis. R. 63. In order to understand the opinion it is vital that the facts be studied. It appears from Vice-Chancellor Fielder's opinion in 23 N.J. Mis. R. 63 that the trustees filed seven annual accounts between the years 1931 and 1938 in which appear, in the language of the learned Vice-Chancellor, "items which would call attention of the beneficiaries to the fact that only the first of Hasting's six notes had been collected." The balance of the exceptions there considered in 1942 were taken to the retention of stock by the trustee. Such retention was clearly portrayed in the statement of assets attached to each such seven annual prior accounts. See Pollack v. Bowman, 23 N.J. Mis. R.63 (at p. 76). It therefore appears that the Court of Errors and Appeals, in deciding Pollack v. Bowman, supra, had before it a set of facts in which such a complete disclosure of the conduct of the fiduciary was made by its accounting as to cause the exceptants to be put upon notice and to require them to take the necessary steps to then object to the conduct of the trustee in connection with the investments. *Page 501 
In the matter sub judice, in so far as the mortgages are concerned, objection is made to the legality of the investments, the absence of that degree of care required of a fiduciary in making investments, and in self-dealing by the trustee.
An examination of the 1932 account, with the attached schedule of assets as filed, exhibits that the sole information given or disclosure made concerning the mortgages questioned was a reference to the street number of the real estate security and the amount of the mortgage. There was nothing in the account which would disclose the value of the real estate involved at the time the mortgage was obtained; whether the trustees obtained a proper appraisal of the value of the real estate which was security for the mortgages; whether any physical inspection was made of the premises; whether any investigation was made of the financial responsibility of the mortgagors; who the mortgagors were; when the mortgage was acquired, and whether the accountant was guilty of self-dealing and had any interest or made any profit out of the sale of the securities to the trust estate. These are the principal questions now raised by the exceptants and it cannot be said that the accountant made such a full and complete disclosure upon its intermediate account as is required to obtain the repose desired by it. The very nature of the present exceptions and the disclosures at the trial exhibit the reason for requiring a complete disclosure. There was nothing in the account which could have put exceptants upon notice of any illegality or invalidity attendant upon the mortgage investments. Further, the accountant filed only two accounts of its stewardship in a period of 22 years, the first after nine years of functioning as a trustee and the second 13 years thereafter. There is not here present the regularity of filing accounts that was evidenced in Pollack v. Bowman, supra, with the resulting disclosure of the manner of management. The accountant therefore fails in this defense in so far as the mortgage investments are concerned.
The exception to the continued holding of the Electric and Peoples Traction Company stock trust certificates and the Union Traction Company stock stands upon a different footing. The objection most strenuously argued by exceptants *Page 502 
is that these securities should have been sold at some date prior to 1931. The original account of the executors, filed in Orphans Court on July 3d 1923, clearly lists these securities and those of the Philadelphia Rapid Transit Company.
On September 26th, 1923, the Orphans Court entered a decree of distribution directing, among other things, that securities and cash to the extent of $250,000 be turned over by the executors to the trustee. When the account of the trustee was filed in 1932 there was again attached a list of the investments held by the trustee which clearly showed that the securities of the Electric and Peoples Traction Company and the Union Traction Company were still being held by the trustee. The accounts as well demonstrated that dividends had been received from these several companies.
The factual situation here is very similar to that in Pollack
v. Bowman, supra (23 N.J. Mis. R. 63). There was a full and complete disclosure in accountant's filed account which apprised exceptants that the accountant continued to hold the securities now complained of at the time of its account in 1932. All of the facts and information which were required by the exceptants to complain of this retention were then available to the present exceptants. It must be remembered that these stocks were listed on the Philadelphia Stock Exchange and that the information concerning the diminution in value between 1923 and 1932 was either then known to or could easily have been obtained by them. They cannot be permitted to sit by and speculate on whether the stock will be enhanced in value after the full information concerning the handling of the same by the trustee has been given to them. It behooved them to punctually litigate the accountant's conduct under the circumstances. Not having availed themselves of this opportunity in 1932, they should not now be heard to complain that the trustee was negligent in this respect.
Exceptants have argued that the retention was as well fraudulently motivated or prompted by the self-interest of some of accountant's directors, who were as well directors of the companies involved. The facts do not sustain such a claim. The mere fact that some of accountant's directors were *Page 503 
stockholders and directors of the companies of which this estate held stock does not serve, in and of itself, to brand the retention improper. The failure to disclose such interest in the corporations whose stock was held by the trustee does not constitute a failure to make the proper disclosure required of accountant. In re Griggs, 125 N.J. Eq. 73; 4 Atl. Rep. 2d59. The testimony disclosed that all of the stock held by this accountant for other estates or by accountant's directors individually or in a representative capacity was handled in the identical manner as the herein-questioned stock was handled. There results therefrom not only no presumption of bad faith, but probably a contrary presumption. Regardless of such a presumption, the accountant may still be liable for not exercising that care and prudence required of it. Shanley v.Fidelity Union Trust Co., 108 N.J. Eq. 564; 138 Atl. Rep. 388,
cited by exceptants, is not applicable.
In so far as the exceptions to the conduct of the trustee in retaining these stock securities are concerned, the exceptants are estopped from now contesting, by reason of the decree of the Orphans Court approving the account, which was dated December 24th, 1932. This estoppel, of course, refers only to the conduct of the trustee in this respect up to December 24th, 1932. Exceptants are not estopped from contesting the continued retention subsequent to that date.
All of the disputed investments were made prior to the 1932 account. The loss, if any, resulting from any failure to diversify occurred prior to 1932. Since all of the information required for a proper disclosure of the diversification of investments was contained in this intermediate account, and since exceptants failed to except at that time, they are now estopped from excepting on this ground. The exception as to diversification is, therefore, disallowed.
As a kindred and related subject to this defense, exceptants have prayed for a re-opening and reconsideration of the account of 1932. In so far as the mortgages are concerned, in view of the foregoing, this is unnecessary. As regards the stock transaction, the exceptants have failed to prove fraud in connection with the decree upon which they predicate their prayer for this relief, and the prayer for the opening of the 1932 decree is denied. *Page 504 
 II. ESTOPPEL BY ACQUISCENCE OF EXCEPTANTS.
An examination of the correspondence discloses that it was almost exclusively with Lillian W. Seidel, the life tenant. The matters primarily discussed were questions of income. Exceptants did receive notice of the mortgage investments but the disclosures were in no more detail than that contained in the 1932 account. The matters and facts which accountant failed to bring to the attention of the exceptants in the 1932 account are as well noticeably here missing. The remaindermen did not receive any of the information concerning income or mortgage investments which the life tenant received. Insufficient has been shown by the accountant to spell out any acquiescence through the implied acquiescence of the exceptants. It is conceded that there was no actual affirmative acquiescence on the part of the life tenant and the remaindermen. To imply acquiescence it must appear that the objectors knew all of the facts, understood their legal rights and acted deliberately in not objecting to an investmnt to which they knew or should have known that they had a right to object. See Pennsylvania Company, c., v. Gillmore, 142 N.J. Eq. 27; 59 Atl. Rep. 2d 24. Defendants fail in this defense.
 III. EXONERATION BY TERMS OF WILL.
The accountant contends that by reason of paragraphs 22 and 24 of the will of Gustavus C. Seidel they are exonerated from any loss resulting to this estate. It must be conceded that by the terms of the instrument creating the trust the liability imposed and assumed by the trustee may be limited.
In Tuttle v. Gilmore, 36 N.J. Eq. 617, the court said as follows at pages 622 and 623:
"In my judgment it is clear, both from principle and authority, that the liability imposed on and accepted by a *Page 505 
trustee may be limited by the terms of the instrument creating the trust. If there is such a clause of limitation the rule for measuring the trustee's liability is to be sought in that clause properly construed. In construing such a clause, the meaning to be attributed to it should be consistent with the purpose and object of the trust, and a strict rule of construction should be applied as against the claim of restriction. But if, when so construed, a limitation on the liability of the trustee was clearly intended, the trustee is entitled to the benefit of it." * * *
"It is argued that the clause exonerates from all breaches of trust, except such as the trustee commits with a view to his personal advantage. But it is obvious that such a construction adds terms to the clause not contained therein and inconsistent with its plain purpose. It is a breach of trust for the trustee to speculate with trust-funds for his own gain, but it is no less a breach of trust to make unauthorized investments or take speculative risks, though for the benefit of the fund and not the trustee. To do so knowingly is a willful and intentional breach of trust. In my judgment, it is a willful and intentional breach of trust within the meaning of this clause, to knowingly do any act hazarding trust-funds, in violation of a duty imposed on the trustee. That this construction may leave but little force to the clause is no reason why it should not be adopted. If the intent of the parties was that the trustee might knowingly risk and hazard the trust-funds without liability, unless he intended to gain thereby, it was easy to express that intent in fitting words. No such words were employed, and no creator of a trust will ever be likely to employ them. The construction no doubt expresses the real intent of the parties." * * *
"If it be considered as an investment of trust-funds, his duty was to ascertain and determine that the securities he was to receive were `good.' Since the consideration to be received and the securities to be taken were mortgages, his duty was to examine the land mortgaged, and to ascertain by proper inquiries that the value thereof was reasonably sufficient to make them good, on which he was to pass his *Page 506 
judgment. The case plainly shows that no proper examination and determination of the value were made. The trustee admits that he had no experience justifying him in determining its value, and he procured no estimates or appraisements of its value from others. He avers that he thought the security sufficient, but is careful to say that his opinion was based partly on the advice of counsel. What other basis it had, he does not disclose. The counsel referred to is not shown to have had any knowledge of the property or its value."
See, also, Conover v. Guarantee Trust Co., 86 N.J. Eq. 450;102 Atl. Rep. 844; affirmed, 89 N.J. Eq. 585;106 Atl. Rep. 890; First National Bank of Paterson v. Jersey Central, c.,Co., 115 N.J. Eq. 242; 170 Atl. Rep. 209; Woodruff v. FreeholdTrust Co., 112 N.J. Eq. 405; 164 Atl. Rep. 411; In re Leupp,108 N.J. Eq. 49; 153 Atl. Rep. 842; Babbitt v. Fidelity Trust Co.,72 N.J. Eq. 745; 66 Atl. Rep. 1076.
That the trustee had the power to invest in securities of the general nature of the securities here in question is not disputed. The exceptants contend, however, that the investments in mortgages were made without proper investigation as to the value of the real estate or the responsibility of the bondsmen; that they were beyond the statutory maximum, that the accountant did not exercise that degree of care and prudence required of fiduciaries in making investments, and that it was guilty of self-dealing. Trustees are bound to the limits placed upon their powers either by law or by the trust instrument and if they transcend such powers and cause damage to the estate they will be held responsible therefor, although they may have acted in perfect good faith. The functions of a trustee are in character conservative rather than speculative. In re Ebert, 136 N.J. Eq. 123; 40 Atl. Rep. 2d 805.
An examination of paragraph 24 of the will, construed as provided for in Tuttle v. Gilmore, supra, leads to the conclusion that the trustee was permitted to make such investments as it might deem safe and proper, without being confined *Page 507 
to investments expressly approved by statute. In effect, this proviso makes it necessary for the fiduciary to exercise only that degree of care and prudence which is normally required of a fiduciary. It could ignore the statutory designation of legal investments and make such other investments as to it might seem safe and proper, but in the event that it did so invest in other than what are commonly called legal securities, the burden is cast upon it to demonstrate the reason for its judgment in considering the investments well-made. The court is still open to it for advice and instructions. In re Buckelew, 128 N.J. Eq. 81;13 Atl. Rep. 2d 855, the court said:
"There is no evidence to indicate that before purchasing, this trustee made any investigation as to the value and soundness of the securities in which it invested, nor of the stability of the companies which sold them. The fact that the president and secretary of Freehold Trust Company, the original trustee, were either stockholders or directors of the Monmouth Title and Mortgage Guaranty Company, should have caused the trustee to refrain from investing in the securities of the Monmouth Title and Mortgage Guaranty Co."
Even if this clause served to permit the trustee to make investments other than those known as "legals" it is still required to exercise that degree of care and prudence in handling the moneys and affairs of the trust estate as is normally required of fiduciaries.
In Tannenbaum v. Seacoast Trust Co., 16 N.J. Mis. R. 234;
affirmed, 125 N.J. Eq. 360; 5 Atl. Rep. 2d 778; 128 N.J. Eq. 176; 15 Atl. Rep. 2d 449, the court said:
"The obligations of a trustee are by no means necessarily confined to those specifically or inferentially contained in the trust instrument. There are certain general obligations imposed upon a trustee by law, even if they be not set forth in the trust instrument — such as the obligation not to deal with himself as an individual with regard to the trust assets; the obligation to exercise good faith toward his beneficiary; and the obligation to use at least the same care and prudence for the preservation of the trust assets that he would as to his own assets." *Page 508 
In Reinhardt v. National State Bank, 130 N.J. Eq. 20Atl. Rep. 2d 654, the court said:
"But if the trust instrument authorizes investment in a class of securities which is not within the statutory scheme, then the creator of the trust is considered to have intended that the trustee should not be limited by the statute but only by the general rules of good faith and reasonable care."
The trustee was not given carte blanche to make investments, regardless of basic principles and without proper consideration. It could still have invested in "legals" and had protection, but it presumed to exercise its own judgment rather than to comply with the statutory mandate and so obtain statutory protection.
The exculpatory provision above referred to of course does not protect the accountant from self-dealing. Self-dealing is in no event countenanced by this court. Pollack v. Bowman, supra.
The twenty-second paragraph of testator's will can have a bearing only on the one mortgage on property known as 332-4 North Second Street, Philadelphia, and the traction company stocks, both of which assets were investments made by the testator. This provision must be read together with so much of the twenty-fourth paragraph as provides "to retain any investments I may have at my death." Strictly construed, as we are obliged to construe such clauses, they permit the retention of testator's investments for such length of time as accountant might deem proper, regardless of the statutory provision, and that diminution in value shall not in itself be evidence of negligence. The clauses cannot be said to relieve the accountant from exercising that degree of care and prudence normally required of a fiduciary nor to excuse a violation of a trust duty. It does not permit the accountant to blindly retain such investments regardless of their value or sufficiency. "Retaining investments is in effect making them."Dickerson v. Camden Trust Co., supra. Under these clauses, the same fidelity, faithfulness, care and prudence is required as is required as above set forth, for the initial making of investments under the twenty-fourth paragraph of the will. *Page 509 
The clauses adverted to do not of themselves absolve accountant from liability because of its conduct of which complaint is now made. This defense is without merit. Therefore, it becomes necessary to determine under the particular facts in this case whether the trustee so conducted itself as to warrant the granting of that protection with which it seeks to cloak itself under the above referred to clause.
Normally, a trustee is required to exercise "that degree of care and caution, skill, sagacity, and judgment, industry and diligence, circumspection and foresight, that an ordinary discreet and prudent person would employ in like matters of his own." In re Ebert, supra, and cases there cited.
In the present case, the corporate trustee held itself out as an expert in the handling of estates and trust accounts. It also held itself out as having particular departments for investments and statistical information, and especial skill in this respect. It had so advertised for a number of years, and with the knowledge of the deceased, who had been a director at the time of his death and for many years theretofore. It therefore represented itself as being possessed of greater knowledge and skill than the average man and, as stated in Ross v. SavingsInvestment and Trust Co., 123 N.J. Eq. 288; 197 Atl. Rep. 59, by Mr. Justice Heher in the opinion for modification:
"And so it was incumbent upon the trustees to exercise such care, skill, diligence and caution as a man of ordinary prudence would practice in like matters of his own. Every trustee is presumed to use in his own affairs of like kind such diligence as is commonly used by all prudent men. And if the trustee possesses greater skill than a man of ordinary prudence, he is under a duty to exercise such skill as he has."
See, also, In re Cross, 115 N.J. Eq. 611; 172 Atl. Rep. 212;In re Chamberlain, 9 N.J. Mis. R. 809; Dickerson v. CamdenTrust Co., supra. It was under a duty to exercise a skill greater than that of an ordinary man. The manner in which investments were handled must be viewed and assayed in the light of such superior skill and ability. *Page 510 
 IV. MORTGAGES.
An examination of the questioned investment in mortgages discloses that the mortgages vested in the accountant as trustee by a variety of methods. One was a mortgage taken by the testator. Four were made directly to the Liberty Title and Trust Company as trustee. Fourteen were made to the Liberty Title and Trust Company individually and either by it assigned to the Liberty Title and Trust Company as trustee or transferred by a declaration.
The mortgages to which exceptions have been taken are 19 in number. For the sake of convenience they will be referred to hereafter by the following numbers:
1. Mascher, Waterloo, Fairhill and Hancock Streets (three mortgages considered as one).
2. 800 Arch Street.
3. 6824 Market Street.
4. 828-30 North Broad Street.
5. 921-5 West Thompson Street.
6. 741 Roosevelt Boulevard.
7. 5655 North Fifth Street.
8. 1724 South Fourth Street.
9. 2150 North Seventh Street.
10. 623 Mifflin Street.
11. 2002 North Front Street.
12. 2060 Bridge Street.
13. 2422 Bolton Street.
14. 2002 So. 68th Street.
15. 332-4 North Second Street.
16. 418 Midvale Road.
17. Mortgage Trust Certificate.
There are two phases of the conduct of the accountant when considering the mortgage investments. The first phase is the initial investment in mortgages and the extensions at maturity, which accrued prior to the recent depression. The second phase is the management of such investments during *Page 511 
the 1930s and to date. I am satisfied that the accountant exercised reasonable judgment and the required care in the handling of these investments subsequent to the depression, which was born in the stock market crash of 1929. During the succeeding years it was difficult to determine what should be done with mortgage securities. The question of whether mortgagors should be permitted to continue to pay merely interest or whether the issue should be brought to a head by the commencement of foreclosure proceedings was something that had to be determined in each individual case.
The accountant, after the year 1930, had appraisals and physical examinations made of the individual properties. It exercised its best judgment during this period. A fiduciary is not liable for loss alone. There must be additional elements present. In re Griggs, supra, the court said at page 76:
"All that the law exacted of our trustee in the administration of its stewardship was an obligation of faithfulness to thecestuis and a duty to exercise ordinary care, prudence and diligence. Smith v. Jones, 89 N.J. Eq. 502;104 Atl. Rep. 380. So long as it acted in good faith, with ordinary care, caution and discretion and within the scope of its powers, our trustee cannot, and will not, be held liable for the consequence of its mere mistakes, even if such there were, resulting from mere errors of judgment and not proceeding from any fraud, gross carelessness or indifference to duty on its part. Monroe v.Osborne, 43 N.J. Eq. 248; 10 Atl. Rep. 267; Heisler v. Sharp,44 N.J. Eq. 167; 14 Atl. Rep. 624; affirmed, 45 N.J. Eq. 367;19 Atl. Rep. 621; In re Leonard, 107 N.J. Eq. 235;152 Atl. Rep. 243; In re Corn Exchange National Bank, 109 N.J. Eq. 169;156 Atl. Rep. 455."
I am satisfied that it exercised that degree of care and caution required of it, and any loss which occurred was not the result of any fraud, indifference or carelessness on its part.
The initial investment in these mortgages, however, referred to above as the first phase, stand on a different footing. It does not impress me that the accountant exercised that degree of care and skill which was required of it, nor did it exercise an unbiased judgment free of self-interest. The grounds for such a determination are as follows: *Page 512 
(1) In each instance in which there appeared a mortgage investment, regardless of whether the original mortgages were made to the accountant as trustee or to it in its individual capacity, one of the conditions of the advancement of the money for a loan or for the purchase of the mortgage was that the borrower obtain a title policy from the Liberty Title and Trust Company. As has been pointed out by the accountant, this title policy was not paid for out of the funds of the trust estate but was paid for by the mortgagor; but it still received a cash remuneration for such policies. The disturbing features of these transactions is not only that the Liberty Title and Trust Company received a premium therefor, but also that it maintained no title plant of its own nor did it make any examination or search of the records preparatory or preliminary to the issuance of title insurance. What it did do was to obtain re-insurance from the Commonwealth Title Company, predicated upon which it issued its own title policy. The accountant issued its policy solely because of such re-insurance. For this re-insurance it paid the Commonwealth Title Company up to 50% of the premium charged for title insurance and up to 75% of the cost of the search fee. The balance of the 50% of the premium and the 25% of the search fee was retained by the Liberty Title and Trust Company for its own use and benefit. This amounted to nothing more than a sharing of premiums, or perhaps a commission from the Commonwealth Title Company to the Liberty Title and Trust Company for obtaining the business. The accountant did profit from the handling of these mortgage accounts to at least the extent of the title insurance premiums.
A trustee will not be permitted to make a penny profit out of the trust estate. The sole profit which a fiduciary may make is from such commissions as may be allowed by the court.
The law requires something more than conduct signalized by diligence and care, free from fraud. It is vital that the trustee not be placed in a position where he might be tempted to sacrifice the interest of the beneficiaries because of a conflicting *Page 513 
personal interest. In Taylor v. Errion, 137 N.J. Eq. 221;44 Atl. Rep. 2d 356, the court said:
"In Meinhard v. Salmon, 249 N.Y. 458; 164 N.E. Rep. 545,
Mr. Justice Cardozo, then a member of the Court of Appeals of New York, made the following comment: `Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.'"
In Shanley v. Fidelity Union Trust Co., supra, the court said:
"It might be slight, but that is unimportant. They are our trustee and the law demands of trustees the utmost fidelity. It does not tolerate personal dealing with the trust estate nor permit the making of a penny's profit. The rule is grounded in sound morals and is reflected in the supplicating words of the Lord's prayer, `Lead us not into temptation.'"
See, also, Dufford v. Nowakoski, 125 N.J. Eq. 262;4 Atl. Rep. 2d 314; In re Bender, 122 N.J. Eq. 192;192 Atl. Rep. 718; In re Kline, 142 N.J. Eq. 20; 59 Atl. Rep. 2d 14.
It is doubtful whether these policies had any efficacy. In case of a loss, accountant might have had to sue itself. It is difficult, nay, almost impossible, to conceive of the Liberty Title and Trust Company, trustee, suing the Liberty Title and Trust Company individually. It might well have found itself in a position where, as trustee, it would have had to enforce a claim against itself individually. It would have had to maintain a hostile position. Its undivided loyalty to *Page 514 
the trust is a fundamental requirement. Accountant's conduct, in so far as these title policies are concerned, was a violation of its duties as a fiduciary.
(2) There appears to be some confusion as to the policy which the accountant as trustee had adopted concerning any maximum percentage of appraised value to be loaned on mortgages. Mr. Jackson testified that the maximum was 66%. There is no testimony as to any other basis except that which is contained in reports of the Pennsylvania Banking Department for the years 1927, 1928 and 1929. From these reports it would seem that the limit for mortgage loans for trust estates for these several years were as follows: 1927 — 50%, 1928 — 50%, 1929 — 60%, and for the bank individually: 1927 — 66%, 1928 — 50%, 1929 — 50% to 60%. The only denial of these figures is in the foregoing statement of Jackson as to trust investment limits.
Mortgages above numbered 1, 2, 3, 4, 9, 10, 12, 14 were in an amount exceeding 60% of accountant's own figures on appraisals. No appraisals were produced for mortgages 5, 6 and 13. For mortgages 5 and 6, however, the appraisals made subsequent to execution of the mortgages, but some time prior to the assignment to this estate, showed a loan in excess of 60%. Although there was no appraisal for mortgage 13, the loan would seem to be less than 60% of the then value of the real estate. Mortgages 7, 8, 11 and 16 were below 60% of the appraised value.
It thus appears that 12 of these mortgages exceeded not only the legal statutory limit of 60% at the time the mortgage was executed, but as well exceeded the bank's individual basis of a maximum of between 50% and 60% for making loans on its own account.
These facts as well demonstrate that the maximum was in excess of that reported to the Banking Department for trust estate loans. A loan on mortgage by a fiduciary in excess of the percentage of appraised value which it would make on its own behalf exhibits not only a lack of that degree of care and prudence required of an ordinarily prudent man but exhibits even more forcefully such a lack where, as here, we have a specialist as a fiduciary. *Page 515 
(3) Apparently the bank had no interest in the financial responsibility of the individual borrowers since in no case was there disclosed a credit report or any examination of the financial responsibility of the respective borrowers prior to the execution of the mortgages. In many instances the mortgagor was disclosed to have advanced personally little or no cash in the purchase of the property, when the total of all mortgages was ascertained. It would certainly seem to be a requirement that an ordinarily prudent and careful man obtain such a credit report where the loan exceeded the statutory limit of 60% of the value of the property, especially where, as here, the settlement sheet in many instances disclosed that the financing on the purchase of the property by the mortgagor was such as to require little or no personal cash investment by him.
(4) There is no disclosure of any actual physical examination of the premises when the mortgages were executed (although on some applications the printed statement "I report that I have examined the property described herein and that the security is ____" with the word "good" in handwriting appearing. This does not refer to the physical condition of the property but to the security), when the mortgages vested in the trust estate or when, upon maturity, extensions were granted.
(5) There is no disclosure of any appraisal of the value of the premises nor credit report as to financial responsibility of the obligor at the time the mortgages were assigned to accountant or extensions of mortgages were granted by it.
(6) The method of pooling the mortgages again raises the question of self-dealing and self-interest. It was testified that the accountant maintained a pool of mortgages which was established for the benefit and convenience of itself, various estates for which it acted as trustee, and of individual customers of the bank. The title to these mortgages was in the accountant individually. The record did not disclose any trust relationship. As an excuse, the accountant stated that as any one of the several estates became possessed of funds which it was necessary for the fiduciary to invest, it could invest in any one of these mortgages without the necessity of *Page 516 
having the funds of the estate remain uninvested while proper investments were sought. In some instances the accountant did not assign the mortgages by formal deed of assignment from itself individually to itself as trustee but merely noted the transfer in its own card index system. Although this latter method might have suited the accountant's convenience, the proper method to have pursued would have been to have recorded an assignment of the mortgage to itself as trustee for a particular estate in the proper public office. This would have resulted in an irrefutable and uncontrovertible title in the estate. The danger of the method pursued is apparent when it is borne in mind that the trustee testified that out of this pool it obtained mortgages as well for its own use. Who determined which mortgages it should retain and which it should sell? Were only such mortgages as exceeded the limit placed on mortgages for its own purposes sold? The temporary use by a corporate trustee of its own funds for the purchase of investments, to be allocated to individual trusts as funds in such trusts became available is not generally here condemned. Under proper conditions and restrictions such conduct is permissible. Pike v. Camden Trust Co., supra. Here, however, we have a pool of mortgages owned by a corporate fiduciary from which it sold various mortgages to third parties and to itself as trustee. Whatever it saw fit to leave in the pool it owned in its individual capacity. The manner in which it operated these investments did not demonstrate it to be free from criticism.
(7) For several other specific examples of the improper manner in which the trustee managed this trust estate, reference is herewith made to the three following instances:
Reference is made first to the group of mortgages designated as No. 1 above. From the facts elicited at the hearing, it developed that the mortgagor in this instance gave this mortgage to the Liberty Title and Trust Company under the following circumstances. One Wesley Caskey, the owner of a washing machine company, had borrowed from the Liberty Title and Trust Company individually, for the benefit of said company the sum of $30,000. This loan was secured by bailment leases on washing machines which had supposedly been *Page 517 
sold to customers. It developed that there were a great many bailment leases which bore forged names. These forged signatures were appended by an employee of said company. The accountant and two other Philadelphia banks had discounted these leases. In order to assure the repayment of said loans the said Caskey transferred certain properties to Charles S. Krumrine, then a vice-president of the accountant. At the time of the transfer to Krumrine the properties were encumbered by a mortgage of $85,000 held by the Kensington National Bank. On August 11th, 1928, the said Krumrine executed and delivered to the accountant his personal bond for $85,000, the proceeds of which went to pay off the Kensington National Bank, which held a first mortgage on the properties. Subsequent thereto, the properties were sold to one John Ross, Jr., whose purchase was made possible by the cash received from an $89,500 mortgage on these properties from this trust and a $57,547.75 advance made by a building and loan association which accepted a second mortgage on the properties. As a result of this transaction the mortgage above referred to, given by Krumrine in the amount of $85,000 to the Liberty Title and Trust Company individually, with accrued interest, was paid off. The Liberty Title and Trust Company received out of the proceeds of the mortgage made by Ross sufficient to pay off the indebtedness with which it was left saddled as a result of its dealings with the washing machine company.
Clearly this is self-dealing, or exhibits a possible antagonistic position which could affect its judgment. Self-interest in liquidating the loan to Caskey could well sway its judgment to the extent of affecting its undivided loyalty and fidelity to this estate. Although the accountant's motives might have been most honorable, it is such conduct as will not be countenanced by this court.
Again, reference is made to the mortgage above referred to as No. 6. There is available no appraisal of the value of the security nor is there available any record of a physical examination of the property when originally taken by the accountant in its individual capacity, nor when it assigned the mortgage to itself as trustee. This mortgage was in the sum of *Page 518 
$9,000 and fell due by its own terms on February 28th, 1926, having been executed on February 28th, 1923. On June 8th, 1925, the accountant sold this mortgage to the trust estate. At the time the mortgage fell due it was not paid nor was payment demanded. It continued in the estate until September 6th, 1929, without the record disclosing any physical examination of the premises, appraisal of the value of the real estate or investigation of the financial responsibility of the mortgagor. On that date the property was valued at $13,500 and the condition was noted as "good." On October 26th, 1932, the owner was advised by the Bureau of Building Inspection of the City of Philadelphia that the building must be "removed, cellar filled up and the integrity of the party well maintained," and it was in a dangerous structural condition. A recital of the above dates would certainly exhibit a failure on the part of the accountant to properly examine, maintain and control the premises. A physical examination should have disclosed some defect in the condition of the premises, which should have signified the dangerous condition of the collateral security and have required a demand for amortization. Within three years after the property had been appraised at $13,500 and its condition noted as "good" and within approximately six years after the mortgage had been sold by Liberty Title and Trust Company individually to itself as trustee, the building was condemned as unsafe. The appraisal of the ground value in 1929 was $5,400. The manner in which this investment was managed demonstrates lack of the requisite care, prudence and diligence with which accountant is charged.
Again, reference is made to mortgage No. 12, which was dated March 3d 1923. This mortgage, in the sum of $5,000, was made by one T. Justus Conley, an employee of the accountant. On February 24th, 1923, there appears on the back of the application for a loan an endorsement signed by an officer of the accountant, stating that the property was worth $5,750 but that "the security offered is considered safe for a loan to Mr. Conley." There also appeared the following endorsement: "It was agreed to take this Mtge. for Mr. Conley for one year on condition that if he sell the property it *Page 519 
must be sold clear of this Mtge. — Mtge. cannot remain for a purchaser." This mortgage was in excess of 80% of the appraised value on the bank's own figures. This is a most glaring example of a haphazard and careless method of making an investment. Surely not even an ordinarily prudent man would make this type of investment! Certainly a specialist in the handling of trust estates, such as this bank held itself out to be, should not have made such an investment!
(8) The mortgage above referred to as No. 15 came into the bank's portfolio as an original investment of the testator. This mortgage was dated August 29th, 1922, in the sum of $6,500, due August 29th, 1925. The trust herein was set up on August 26th, 1923. No assignment of this mortgage was made by the executors to the trustee until October 5th, 1934. Prior thereto no demand for payment was made. No appraisal or physical examination was made until 1929 when the property was appraised at $10,500. The property was then described as being an "old building." It was actually over 100 years old. When the property was finally sold in 1941, after foreclosure, it brought $350 — less than the principal investment and accumulated expenses. The inexplainable failure to assign this mortgage until 1934, when there had then existed an interest default for two years, and the failure to attempt to amortize prior to that date, in themselves show a negligent, careless and dilatory handling of this asset.
(9) The mortgage certificate which was purchased for this estate admittedly does not meet our statutory requirements.Pennsylvania Company, c., v. Gillmore, supra. However, accountant attempts to justify this investment under the twenty-fourth paragraph of the will. There is nothing in the testimony which shows what security was originally pledged nor how many similar certificates were issued. Nothing has been produced to show that accountant was justified in making this investment. Even though the statutory requirement is ignored, accountant has still failed to show the care and prudence in making this investment that is required of it. *Page 520 
The foregoing recital of facts which are common to all of the mortgage investments, and the specific instances of dereliction of duty in particular mortgages, are typical of accountant's general conduct of this trust, in so far as the mortgage securities are concerned. All of the exceptions to the questioned mortgages are allowed for the foregoing reasons.
 V. STOCK.
As has been above stated, the exceptants are barred by estoppel from questioning the retention of the transit company securities and stock up to the date of the decree of the Orphans Court approving the intermediate account, i.e., December 24th, 1932. This, however, does not serve to excuse the continued holding of the stock subsequent to that date. It was still thereafter obliged to exercise that degree of care, skill, diligence and fidelity generally required of a fiduciary.
The retention of an investment is, in effect, making it.Dickerson v. Camden Trust Co., supra.
A trustee may not take speculative risks even though motivated by what he feels is to the interest of the estate.
In Wild v. Brown, 120 N.J. Eq. 31; 183 Atl. Rep. 899, the court said:
"Prudent men properly may, and often do, embark a part of their own capital on speculative enterprises, but it is a breach of trust for a trustee to take speculative risks, though for the benefit of the estate. Tuttle v. Gilmore, 36 N.J. Eq. 617. A speculative investment is one in which there is a substantial danger of loss of principal balanced by a prospect of appreciation of principal or by the receipt of an abnormal rate of income. Some few common stocks, because of the ample assets which they represent, the steady earnings of the company and the conservatism of its management, fall into the class of safe investments, and such the trustee may properly retain. But stock which is of a speculative nature must be disposed of. A trustee is not justified in continuing to hold it, merely in the hope that the market will go up. General *Page 521 
authority given by will or by statute to retain investments is not an authority to speculate. A trustee may retain only safe investments and may retain them only so long as they remain safe."
See, also, In re Cross, supra.
In In re Buckelew, supra, the court said:
"It is the duty of a trustee to use every reasonable effort to inform itself as to the value and the soundness of the trust investments and to keep a careful check of fluctuating values. If it be in doubt in a situation then it behooves it to seek instructions from the court as to its course of action in the premises."
In Dickerson v. Camden Trust Co., supra, the court said:
"Even where securities are retained by a trustee pursuant to statute or a direction in the will, the trustee is privileged to retain them only so long as they remain safe. Wild v. Brown,120 N.J. Eq. 31; Babbitt v. Fidelity Trust Co., 72 N.J. Eq. 745."
The testimony of Mr. Ambler discloses that there were three different stages in the nature and value of these investments. The first period is from 1924 to 1929 when it was speculative. It enjoyed none of the enhanced values which were common to stocks during this time. It was then apparent that street railway companies had or were about to meet sharp competition. From 1931 to 1934 the speculative characteristics increased and the "investment" characteristics decreased. From 1934 to 1940, when the bankruptcy proceedings took place, it was entirely speculative. These stocks were risky even prior to 1929. In 1934 the Electric Peoples Traction Company defaulted upon its interest. Exhibit E67 shows a steady decline in the market value of these stocks from a high for Electric Peoples trust certificates of 66 in 1924 to a low of 5 3/4 in 1940, and from a high for Union Traction Company common stock of 43 in 1924 to a low of 2 3/8 in 1940. The regular and annual diminution in market values should have sounded a warning which accountant was obliged to heed. The testimony in explanation of accountant's conduct was that it felt that there was "intrinsic" value in this stock. This is speculation in itself. For this reason *Page 522 
it ignored the steady depreciation of a stock listed on the Philadelphia Stock Exchange.
This again exhibits a course of conduct not consistent with that degree of care, prudence and diligence required of this trustee. It failed in salutary respects to obey the mandate of the above cited cases. If it had been in doubt it could have sought the court's advice. These securities were held beyond the time when they were safe.
This stock should have been disposed of prior to the decree of December 24th, 1932, but in view of the preceding determination concerning its conduct to that date, it is now held that it should have sold these securities within a reasonable time after December 24th, 1932, it having by that time had all the necessary information in its possession or available to it to justify such a sale. One month after that date should have constituted a reasonable time. It will, therefore, be held for the difference between the highest price obtainable between December 24th, 1932, and January 24th, 1933, and what was actually received by it. SeeBabbitt v. Fidelity Trust Co., supra.
In view of the nature of the exceptions and the conduct of the trustee, the Liberty Title and Trust Company will be held liable not only for the principal involved in the several investments where the exceptions have been sustained, but interest thereon as well. The loss of income is due to its conduct of the affairs of the estate. The amount of interest should be one that is equitable under all of the circumstances and should approximate as closely as possible the amount which the beneficiaries would have received except for the trustee's derelictions. There is no proof of fraud or bad faith. See Pennsylvania Company, c., v.Gillmore, supra.
On each investment to which exception has been sustained the trustee will be charged with the amount of income actually received by it, but in no event at a rate of simple interest less than 4% per annum. The trustee will also be charged on each such investment where no income was produced, simple interest at the rate of 4% per annum for the period of such failure to produce income. On the amount for which it is surcharged for the retention of the traction company *Page 523 
stocks and securities it will be charged simple interest at the rate of 4% per annum from the date when it should have sold said stock.
The final exceptions of Joseph W. Wells et al. become more or less academic in view of the foregoing. Since Lillian W. Seidel was entitled to the "net income" of the trust estate under the third paragraph of testator's will, her estate is entitled to such income as was paid or as will be paid as a result of this litigation. The failure to receive that income during her lifetime is attributable to the improper manner in which the estate was managed by accountant. The question of apportionment is of no moment to her executrix and appointees since they will hereunder receive everything to which she was entitled during her lifetime.
There is here absent any proof of willful wrong, fraud or gross misconduct. Under these circumstances, accountant is entitled to commissions and counsel fee in connection with the management of the estate. Costs and counsel fees arising out of the present proceedings should be borne by the trustee. It was as a result of its fault that it was surcharged and these proceedings were necessitated. Pennsylvania Company, c., v. Gillmore, supra.